In the MATTER OF the GUARDIANSHIP AND PROTECTIVE PLACEMENT OF EDNA M.F.:

Betty SPAHN, Guardian of Edna P.F. and Mark Wittman, Guardian Ad Litem for Edna M.F., Appellants,

v.

Howard B. EISENBERG, Respondent-Designate.

Supreme Court

*No. 95–2719. Oral argument January 8, 1997.—Decided June 12, 1997.*

(Also reported in 563 N.W.2d 485.)

557

For the appellant there were briefs (in the Court of Appeals & Supreme Court) by *John R. Hutchinson* and *Wynia & Billings, S.C.*, Marshfield and oral argument by *John R. Hutchinson*.

For the Guardian Ad Litem there was a brief (in the Supreme Court) by *Mark J. Wittman* and *Zappen & Meissner*, Marshfield and oral argument by *Mark J. Wittman*.

For the respondent-designate there was a brief and oral argument (in the Supreme Court) by *Howard B. Eisenberg*, Milwaukee.

Amicus curiae brief was filed (in the Court of Appeals) by *William P. Donaldson*, Madison for the Board on Aging and Long Term Care of the State of Wisconsin.

Amicus curiae brief was filed (in the Court of Appeals) by *Betsy J. Abramson*, Madison, for the Elder Law Center of the Coalition of Wisconsin Aging Groups.

¶ 1.   DONALD W. STEINMETZ, J. Betty Spahn (Spahn) seeks review of a decision by the Circuit Court for Wood County, Judge Dennis D. Conway, denying her request to withdraw artificial nutrition from her sister, Edna M.F. The court held that it was without authority to grant Spahn's request because Edna is not

in a persistent vegetative state. This case presents this court with two issues:

¶ 2.   1) Whether the guardian of an incompetent person who has not executed an advance directive and is not in a persistent vegetative state has the authority to direct withdrawal of life-sustaining medical treatment from the incompetent person; and

¶ 3.   2) Whether in this case, notwithstanding the fact that she is not in a persistent vegetative state, there is a clear statement evidenced in the record of Edna's desire to die rather than have extreme measures applied to sustain her life under circumstances such as these.

¶ 4.   Relying on this court's previous decision in *In re Guardianship of L.W.*, 167 Wis. 2d 53, 482 N.W.2d 60 (1992), we hold that a guardian may only direct the withdrawal of life-sustaining medical treatment, including nutrition and hydration, if the incompetent ward is in a persistent vegetative state and the decision to withdraw is in the best interests of the ward. We further hold that in this case, where the only indication of Edna's desires was made at least 30 years ago and under different circumstances, there is not a clear statement of intent such that Edna's guardian may authorize the withholding of her nutrition.

¶ 5.   Edna M.F. is a 71-year old woman who has been diagnosed with dementia of the Alzheimer's type. She is bedridden, but her doctors have indicated that she responds to stimulation from voice and movement. She also appears alert at times, with her eyes open, and she responds to mildly noxious stimuli.[1] According to these doctors, her condition does not meet the defini-

---

[1] In his testimony at trial, Dr. John Przybylinski, one of Edna M.F.'s doctors, described the mildly noxious stimuli as "either pinching her arm or her leg or rubbing her sternum."

tion of a persistent vegetative state. In 1988, a permanent feeding tube was surgically inserted in Edna's body. Edna currently breathes without a respirator, but she continues to receive artificial nutrition and hydration. Edna's condition is not likely to improve.

¶ 6. Edna's sister and court-appointed guardian, Betty Spahn, seeks permission to direct the withholding of Edna's nutrition, claiming that her sister would not want to live in this condition. However, the only testimony presented at trial regarding Edna's views on the use of life-sustaining medical treatment involves a statement made in 1966 or 1967. At that time, Spahn and Edna were having a conversation about their mother, who was recovering from depression, and Spahn's mother-in-law, who was dying of cancer. Spahn testified that during this conversation, Edna said to her: "I would rather die of cancer than lose my mind." Spahn further testified that this was the only time that she and Edna discussed the subject and that Edna never said anything specifically about withholding or withdrawing life-sustaining medical treatment.

¶ 7. In October of 1994, the Ethics Committee at the Marshfield Nursing and Rehabilitation, the facility where Edna lives, met to discuss the issue of withholding artificial nutrition from Edna. The committee approved the withholding of the nutrition if no family member objected. However, one of Edna's nieces refused to sign a statement approving the withdrawal of nutrition.

¶ 8. On January 12, 1995, Spahn filed a petition in Wood County Circuit Court as guardian of an incompetent person, Edna M.F., asking the court to issue an order confirming Spahn's decision to withhold nutrition from Edna. On January 13, 1995, the court

appointed Mark Wittman (Wittman) as the guardian ad litem. The court denied Spahn's petition. The case is now before this court on a petition to bypass the court of appeals. However, because both Spahn and Wittman are arguing to withhold nutrition, this court has appointed Attorney Howard Eisenberg as respondent-designate to argue for sustaining the life of Edna M.F.

¶ 9.    The issue of the right to terminate life-sustaining medical treatment first came to the national forefront in the controversial case *In re Quinlan*, 355 A.2d 647 (N.J. 1976), *cert. denied sub nom.*, 424 U.S. 922 (1976). In *Quinlan*, Joseph Quinlan petitioned the court to be appointed guardian of his 21-year old daughter, Karen. Karen was in a chronic persistent vegetative state[2] and her father sought the express power to authorize "the discontinuance of all extraordinary medical procedures now allegedly sustaining Karen's vital processes and hence her life. . . ." *Id.* at 651. Because Karen existed in a persistent vegetative state, and there was no hope of her ever recovering from this state, the court granted Joseph Quinlan's requests. *Id.* at 671–72.

¶ 10.    Fourteen years later, the United States Supreme Court considered whether the state of Missouri could require clear and convincing evidence of an incompetent's wishes before authorizing the withdrawal of life-sustaining medical treatment, including

[2] Dr. Fred Plum, the doctor who created the term, defined a person in a persistent vegetative state "as a subject who remains with the capacity to maintain the vegetative parts of neurological function but who. . .no longer has any cognitive function." *Quinlan*, 355 A.2d at 654. Cognitive function can be best understood as "either self-awareness or awareness of the surroundings in a learned manner." *See In re Jobes*, 529 A.2d 434, 438 (N.J. 1987).

nutrition and hydration, when the incompetent is in a persistent vegetative state.[3] *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990). In making its decision, the Court determined that the states have an interest in protecting the lives of their citizens and that that interest is demonstrated, among other ways, "by treating homicide as a serious crime." *Id.* at 280. On the other hand, the Court notes that "[i]t cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment." *Id.* at 281. The Court concludes that the rights of the state and the individual must be balanced: "we think a State may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interests of the individual." *Id.*

¶ 11. The Court upheld the decision of the Missouri Supreme Court to require that a guardian meet a "clear and convincing" standard before terminating an incompetent's life-sustaining medical treatment, including artificial nutrition and hydration.[4] The Court explained that these life-and-death decisions

---

[3] The Court in *Cruzan* defined persistent vegetative state as "a condition in which a person exhibits motor reflexes but evinces no indications of significant cognitive function." *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 266 (1990).

[4] We note here that the *Cruzan* Court did not decide that the liberty interest in refusing life-sustaining medical treatment includes the right to refuse nutrition and hydration. The Court merely assumed so for the purposes of ruling on the proper evidentiary standard in the case. *See In re Guardianship of L.W.*, 167 Wis. 2d 53, 71, 482 N.W.2d 60 (1992).

have great consequences, and that an erroneous decision to terminate cannot be remedied:

> An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw of life-sustaining treatment, however, is not susceptible to correction.

*Id.* at 283–84.

¶ 12. Two years after the *Cruzan* decision was rendered, this court was faced with a similar case, *In re Guardianship of L.W.*, 167 Wis. 2d 53, 482 N.W.2d 60 (1992). In *L.W.*, this court considered the issue of whether an incompetent individual in a persistent vegetative state has the right to refuse life-sustaining medical treatment, including nutrition and hydration. The court further considered whether a court-appointed guardian may exercise that right on behalf of the incompetent patient. This court began its analysis of the situation with an exploration of the possible constitutional rights implicated by these circumstances, and concluded "that an individual's right to refuse unwanted medical treatment emanates from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, section I of the Wisconsin Constitution." *Id.* at 67.

¶ 13.    This court further concluded that the right to refuse unwanted treatment applies to both competent and incompetent individuals, and that the right of the incompetent to refuse may be exercised by his or her guardian. *Id.* at 73, 76. The court in *L.W.* then faced the choice of what standard the guardian should apply in determining whether to continue life-sustaining medical treatment. The guardian argued for a subjective test considering the ward's past values, wishes, and beliefs (the "substituted judgment" standard), and the guardian ad litem argued in favor of the standard upheld in *Cruzan* requiring "clear and convincing evidence" of the ward's desires. Noting that this court has rejected the substituted judgment standard in the past[5] and that the clear and convincing evidence standard would be too strict, this court concluded that an objective "best interests" standard was the appropriate standard to apply when deciding whether to withdraw life-sustaining medical treatment from an incompetent ward in a persistent vegetative state. *Id.* at 76, 78, 81. The only thing that matters in the decision-making process is what would be in the ward's best interests. Of course, the court noted, if the wishes of the ward are clearly evidenced, then it is in the best interests of the ward to have his or her wishes honored. *Id.* at 79–80.

---

[5] In the case of *In re Guardianship of Pescinski*, 67 Wis. 2d 4, 7–8, 226 N.W.2d 180 (1975), this court held that a guardian must act under the "best interests" standard with respect to the ward, and the court explicitly declined to adopt the "substituted judgment" standard.

In the case of *In re Guardianship of Eberhardy*, 102 Wis. 2d 539, 307 N.W.2d 881 (1981), the court again chose to apply the "best interests" standard to the guardian-ward relationship. *See Id.*, at 566, 567.

¶ 14. In sum, this court concluded in *L.W.* "that an incompetent individual in a persistent vegetative state has a constitutionally protected right to refuse unwanted medical treatment, including artificial nutrition and hydration," and that a guardian may consent to withholding or withdrawal of such treatment without prior approval of the courts if to do so is in the "best interests" of the ward. *Id.* at 63. However, this court stressed the fact that the opinion in *L.W.* "is limited in scope to persons in a persistent vegetative state." *Id.*

¶ 15. Spahn asks this court to extend *L.W.* beyond its current scope to include incompetent wards who are not in a persistent vegetative state. Spahn notes that in *L.W.*, this court concluded that the right to refuse unwanted medical treatment applies to competent and incompetent people alike, even if there has been no advance directive on the part of the incompetent ward.

¶ 16. In the case *In re Guardianship of Eberhardy*, 102 Wis. 2d 539, 307 N.W.2d 881 (1981), this court was faced with the request to authorize a guardian of an incompetent to consent to the sterilization of the incompetent, a mentally disabled woman. The guardian argued that since the competent person has the right to sterilization, that right should not be withheld from the incompetent. This court explained in *Eberhardy* that even though all citizens have the same constitutional rights, the United States Supreme Court has recognized that "the uninhibited exercise of those rights may be hedged about with restrictions that reflect the public policy of protecting persons of a distinct class." *Id.* at 572. For example, this court notes that the Supreme Court has recognized that the decision by a minor to have an abortion could be

566

circumscribed by action requiring a showing of maturity or "best interests" to make a decision without parental involvement. *Id.* at 572, citing *Bellotti v. Baird*, 443 U.S. 622 (1979). Additionally, a state may require a physician to notify a minor's parents before agreeing to perform an abortion. *Id.* at 572–73, citing *H.L. v. Matheson*, 450 U.S. 398 (1981).

¶ 17. The *Eberhardy* court proceeded to explain that the mentally disabled are a similar class to minors in that they are also subject to "special protections of the state" because many mentally disabled adults are "not competent to exercise a free choice." *Id.* at 573. The court explained that "[w]hile the Constitution would generally mandate a free choice for sui juris adults, a free choice is an empty option for those who cannot exercise it." *Id.*

¶ 18. This brings us to the situation at hand—whether this court should allow surrogate decisionmakers to decide to withhold or withdraw life-sustaining medical treatment from an incompetent adult who is not in a persistent vegetative state. This court in *Eberhardy* said that for the purposes of sterilization, incompetent people are to be considered "a distinct class to whom the state owes a special concern." *Id.* at 574. So, although incompetent adults have the same constitutional rights as competent adults, they do not have the same ability to exercise those rights. Someone must instead act in the best interests of that person to make a decision regarding whether to withhold or withdraw life-sustaining treatment. However, if that person is not in a persistent vegetative state, this court has determined that, as a matter of law, it is not in the best interests of the ward to withdraw life-sustaining treatment, including a feeding tube, unless the ward has executed an advance direc-

tive or other statement clearly indicating his or her desires.

¶ 19. One of the main reasons that this court in *L.W.* limited the scope of its holdings is the fact that The American Academy of Neurology explains that people in a persistent vegetative state do not feel pain or discomfort. *L.W.*, 167 Wis. 2d at 87, note 17. In the case at bar, Edna M.F. is not in a persistent vegetative state and could therefore likely feel the pain and discomfort of starving to death. Even a competent person cannot order "the withholding or withdrawal of any medication, life-sustaining procedure or feeding tube" if "the withholding or withdrawal will cause the declarant pain or reduce the declarant's comfort" unless the pain or discomfort can be alleviated through further medical means. Wis. Stat. § 154.03(1). *See also* Wis. Stat. § 155.20(4). In the case where withdrawal of life-sustaining medical treatment, including nutrition or hydration, will cause pain or discomfort, then, the competent and incompetent person have exactly the same rights.[6]

¶ 20. This court has established a bright-line rule in *L.W.* that the guardian of an incompetent ward possesses the authority to direct withholding or withdrawal of life-sustaining medical treatment, including artificial nutrition and hydration, if it is in the best interests of the ward and the ward is in a persistent vegetative state. Spahn now asks this court to extend the scope of *L.W.* to include those incompetent patients who are afflicted with incurable or irreversible conditions of health. We decline to go down this slippery

---

[6] Of course, a competent and incompetent person always have the same rights. *See generally In re Guardianship of L.W.*, 167 Wis. 2d 53, 73–74, 482 N.W.2d 60 (1992).

slope, for the consequences and the confusion may be great. One author explains as follows:

> While at first euthanasia may be institutionalized only for those in terrible pain, or those who are terminally ill, or those for whom it is otherwise appropriate, the pressure of the allocation of health care resources will inevitably enlarge the class for whom euthanasia is deemed appropriate. Every society has a group who are deemed to be socially unworthy and members of that group—the unedu-cated, the unemployed, the disabled, for example—will become good candidates for euthanasia.

Barry R. Furrow et al., *Bioethics: Health Care Law and Ethics* 325 (1991). This court has drawn a bright-line in *L.W.*, and we will not venture down the slippery slope of extending it when there is insufficient evidence of the ward's desires.

¶ 21. Even though Edna M.F. is not currently existing in a persistent vegetative state, if her guardian can demonstrate by a preponderance of the evidence a clear statement of Edna's desires in these circumstances, then it is in the best interests of Edna to honor those wishes.[7] *See L.W.*, 167 Wis. 2d at 79–80. The reason this court requires a clear statement of the ward's desires is because of the interest of the state in preserving human life[8] and the irreversible nature of

---

[7] We stress that this right has been limited by the legislature in Wis. Stat. § 154.03(1), which does not permit withdrawal of life-sustaining medical treatment, including nutrition and hydration, if it would cause pain or discomfort unless the pain or discomfort can be alleviated through further medical means.

[8] This court has set out the four relevant state interests that must be considered in making decisions about medical treat-

the decision to withdraw nutrition from a person. This court explained the magnitude of this type of decision as compared to other, less permanent, decisions in *Eberhardy*:

> Importantly, however, most determinations made in the best interests of a child or an incompetent person are not irreversible; and although a wrong decision may be damaging indeed, there is an opportunity for a certain amount of empiricism in the correction of errors of discretion. Errors of judgment or revisions of decisions by courts and social workers can, in part at least, be rectified when new facts or second thoughts prevail. . . . Sterilization as it is now understood by medical science is, however, substantially irreversible.

*Eberhardy*, 102 Wis. 2d at 567–68. Like sterilization, the decision to withdraw life-sustaining medical treatment is also not reversible, because death is not reversible. It is for this reason, then, that we require a guardian to show a clear statement of the ward's desires by a preponderance of the evidence.

¶ 22. We now turn to the case at bar to determine whether there is sufficient evidence in the record to reflect a clear statement of desire by Edna M.F. while she was still competent. The trial court did not make an explicit factual finding as to whether the guardian met this burden. However, it did mention in its memorandum decision that none of the witnesses who

ment decisions for incompetent people. These are 1) preserving life, 2) safeguarding the integrity of the medical profession, 3) preventing suicide, and 4) protecting innocent third parties. *In re Guardianship of L.W.*, 167 Wis. 2d 53, 90. Preserving life is the most significant state interest at issue here. *See id.*

presented letters and affidavits to the court ever discussed the matter with Edna M.F., and that the only testimony as to Edna's opinions on the situation dates back to 1966 or 1967. Generally, findings of fact shall not be set aside unless they are clearly erroneous, Wis. Stat. § 805.17(2), but in a situation where there are no explicit factual findings, "this court may affirm the judgment if '[a] perusal of the evidence shows that the court reached a result which the evidence would sustain if specifically found.' " *Grimh v. Western Fire Ins. Co.*, 5 Wis. 2d 84, 89, 92 N.W.2d 259 (1958) (citations omitted).

¶ 23.    The record speaks very little to what Edna's desires would be under the current circumstances. We know from the record that she was a vibrant woman, a gifted journalist, and a devout Roman Catholic. We know that she was and is loved dearly by her family and friends, and that the majority of them feel that she "would not want to be kept alive" in this condition. We know that in 1966 or 1967 during a time of family crisis, she said that she "would rather die of cancer than lose [her] mind." But we do not have any clear statement of what her desires would be today, under the current conditions. Her friends and family never had any conversations with her about her feelings or opinions on the withdrawal of nutrition or hydration, and she did not execute any advance directives expressing her wishes while she was competent.

¶ 24.    There is a presumption that continuing life is in the best interests of the ward. *L.W.*, 167 Wis. 2d at 86. The only evidence in the record of Edna's desires is the general statement she made to her sister in 1966 or 1967. We understand how difficult Edna's illness has been on her loved ones, and we sympathize with their plight, but the evidence contained in the record is sim-

ply not sufficient to rebut the presumption that Edna would choose life. A perusal of the record and the insufficiency of the evidence contained therein supports the result the trial court reached, even though there was no explicit factual finding by the trial court on this issue.

¶ 25.   In conclusion, this court declines to extend the scope of *L.W.* beyond those incompetent wards who are currently in a persistent vegetative state; we will not apply *L.W.* to those with incurable or irreversible conditions. As such, we re-affirm the decision of this court in *L.W.* that the threshold at which this court will authorize the withholding or withdrawal of life-sustaining medical treatment is the point at which trained medical doctors diagnose a patient as being in a persistent vegetative state.

¶ 26.   Whether or not a patient is in a persistent vegetative state is a medical, not legal, determination. If Edna M.F.'s doctors determine she is now in a persistent vegetative state and the guardian determines that it is in the best interest of Edna, she may be authorized to withhold nutrition and hydration. As it now stands, however, the facts of this case do not support a finding that Edna M.F. is in a persistent vegetative state. That is the rule of *L.W.* and we decline to extend that rule.

¶ 27.   Consequently, we hold that a guardian may only direct the withdrawal of life-sustaining medical treatment, including nutrition and hydration, if the incompetent ward is in a persistent vegetative state and the decision to withdraw is in the best interests of the ward. We further hold that in this case, where the only indication of Edna's desires was made at least 30 years ago and under different circumstances, there is

not a clear statement of intent such that Edna's guardian may authorize the withholding of her nutrition.

*By the Court.*—The decision of the Wood County Circuit Court is affirmed.

¶ 28. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*concurring*). I join in the mandate. I agree that *In the Matter of Guardianship of L.W.*, 167 Wis. 2d 53, 482 N.W.2d 60 (1992), should not be extended to persons not in a persistent vegetative state.[1]

¶ 29. I write separately because I believe (1) that the majority opinion's characterization of Ms. F.'s condition is incomplete and (2) that further discussion of the application of *L.W.* to the present case is needed.

---

[1] The guardian, the guardian ad litem, the two amici, and counsel appointed by this court to support the order of the circuit court agree that at the time of the hearing Ms. F. was not in a persistent vegetative state. The guardian and guardian ad litem would have preferred that the attending doctor opine that Ms. F. was in a persistent vegetative state because the guardian could then have directed the withdrawal of nutrition without authorization from the court if two independent physicians concurred in the diagnosis. Yet the guardian accepted the diagnosis of Ms. F.'s attending doctors at that time.

Because of the attending doctor's diagnosis, the guardian, the guardian ad litem and the amici came to court to urge the court to authorize circuit courts to confirm a guardian's decision to direct withdrawal of nutrition from a person not in a persistent vegetative state. Thus counsel urge us to extend *In the Matter of Guardianship of L.W.*, 167 Wis. 2d 53, 482 N.W.2d 60 (1992). Court-appointed counsel urges us to adhere to *L.W.*

The amici curiae are the Elder Law Center of the Coalition of Wisconsin Aging Groups and the Board on Aging and Long Term Care of the State of Wisconsin. Each filed a brief.

## I.

¶ 30.   I write first to explain my disagreement with the majority opinion's characterization of some parts of the record.

¶ 31.   The majority's discussion of Ms. F.'s condition does not do justice to the factual record. The majority describes Ms. F. as bedridden, responsive to stimulation and appearing alert at times. Majority op. at 561-62. While this description is true, it conveys an inaccurate picture of Ms. F.'s medical situation. Ms. F. breathes without assistance but in all other respects is dependent on others for her care and continued existence. Ms. F.'s muscles have deteriorated to the point where her limbs are contracted and immobile. She demonstrates no purposeful response, such as withdrawal, to tactile, aural or visual stimuli; she makes non-specific responses to pinching or tapping of the arm or sternum. There is also some testimony suggesting Ms. F. occasionally may track movements in the room with her eyes.

¶ 32.   Two attending physicians testified; only Dr. Erickson, however, was asked to opine on whether Ms. F. was in a persistent vegetative state at the time of his examination of her. Dr. Erickson testified as follows:

> The definition [of persistent vegetative state] as described in the journal of neurology in 1989, January, 1989, requires that there be no behavioral response whatsoever over an extended period of time, and that no voluntary action or behavior of any kind is present. As I testified before, Edna, in my opinion, has provided evidence of some minimal response to stimulation from her surrounding, and so in the strict definition, I would have to say that she approximates but does not entirely meet that definition of the persistent vegetative state.

R. 19 at 33.

¶ 33. The circuit court made the following finding of fact, in accord with the guardian's position and the evidence presented: "Edna M.F. is a 71 year old woman whose mental condition approximates but does not meet the clinical definition of persistent vegetative state." Given the record in this case the circuit court's finding that Ms. F. is not in a persistent vegetative state is not clearly erroneous.[2]

¶ 34. The other important factual question is whether Ms. F. made a clear expression of her wishes regarding life-sustaining medical treatment. I agree with the majority opinion that the record supports the finding that she did not and the circuit court's memorandum decision implies such a finding. That finding is not clearly erroneous.

## II.

¶ 35. I have some concern about the majority opinion's characterization of several aspects of the *L.W.* decision.

¶ 36. *L.W.* largely controls our decision in the present case. *L.W.* held that a guardian may consent to

---

[2] The majority opinion embellishes the record when it concludes that Ms. F. could "likely feel the pain and discomfort of starving to death." Majority op. at 569. Dr. Erickson testified that in his opinion Ms. F. was not experiencing any pain. R. 19 at 34, 51–52. Dr. Przybylinski testified that he thought Ms. F. could experience pain but that a physician could not determine this fact. R. 19 at 63, 68–69. The circuit court made no finding, express or implied, regarding whether Ms. F. retains sufficient cortical function to feel pain. Retention of the feeding tube would enable the clinic staff to continue to provide Ms. F. with fluids and, if deemed necessary, with pain medication, while nutrition was withheld.

the withholding or withdrawal of life-sustaining medical treatment on behalf of one who was never competent, or a once competent person whose conduct was never of a kind from which one could draw a reasonable inference upon which to make a substituted judgment,[3] when: (1) the attending physician and independent physicians determine with reasonable medical certainty that the patient is in a persistent vegetative state and has no reasonable chance of recovery to a cognitive and sentient life; and (2) the guardian determines in good faith that the withholding or withdrawal of treatment is in the ward's best interests. *L.W.*, 167 Wis. 2d at 84–85.

¶ 37.   I feel it necessary to state what I believe L.W. does and does not stand for and to offer further discussion of the application of *L.W.* to the facts of this case.

¶ 38.   First, *L.W.* held that a person's right to refuse life-sustaining medical treatment includes the right to refuse the provision of nutrition and hydration. *L.W.*, 167 Wis. 2d at 70–73.[4] It is therefore of no

---

[3] I agree with the majority opinion that the ward in the present case had not made a clear expression, when competent, of her wishes with regard to life-sustaining medical treatment.

[4] Despite the objection raised in the dissenting opinion in *L.W.*, 167 Wis. 2d at 99 (Steinmetz, J., dissenting), the court concluded its thorough consideration of the issue as follows: " Consistent with the implied holding of the United States Supreme Court, and the specific declaration of the Wisconsin legislature, we conclude that an individual's right to refuse unwanted life-sustaining medical treatment extends to artificial nutrition and hydration." *L.W.*, 167 Wis. 2d at 73. In response to the dissenting opinion the *L.W.* majority stated:

The dissent asserts that this conclusion is 'unwarranted and misconceived' because *Cruzan* did not decide the issue. . . . It is clear

moment that the United States Supreme Court "merely assumed" this fact in *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261 (1990), as the majority opinion states. Majority op. at 564 n.4. There is no longer any doubt that the provisions of nutrition and hydration by artificial means are forms of medical treatment in Wisconsin.

¶ 39.   Second, *L.W.* held that a surrogate decision maker must apply a best interests test to determine the propriety of withholding life-sustaining medical treatment to a person who was never competent or a person whose conduct while competent was never of a kind from which one could draw a reasonable inference upon which to make a substituted judgment. *L.W.* 167 Wis. 2d at 75–76. *L.W.* did not establish whether a substituted judgment test or other test is appropriate to determine the propriety of withholding life-sustaining medical treatment from a person who gave indication while competent of his or her wishes regarding such treatment. Nor did *L.W.* address the proper test to be used when the incompetent person is not in a persistent vegetative state. *L.W.* was concerned with a person in a persistent vegetative state who by all indications had never been competent. There was, therefore, no basis on which a guardian or a court could make a substituted judgment and only under such circumstances did the court rule out a substituted judgment test. *L.W.* 167 Wis. 2d at 78–79 and n.11. It would be inaccurate to conclude that the substituted

that we base our conclusion that artificial nutrition and hydration is medical treatment which may be refused primarily on the fact that it is indistinguishable from other forms of treatment and not on the ambivalence of the *Cruzan* majority.

*Id.* at 73 n.7.

judgment test has been rejected in other circumstances.

¶ 40.   I take the majority opinion to imply that *L.W.* rejected the substituted judgment test for all persons in a persistent vegetative state:

> Noting that this court has rejected the substituted judgment standard in the past [citing *In re Guardianship of Pescinski*, 67 Wis. 2d 4, 7–8, 226 N.W.2d 180 (1975) and *In re Guardianship of Eberhardy*, 102 Wis. 2d 539, 566–67, 307 N.W.2d 881 (1981)] and that the clear and convincing evidence standard would be too strict, this court [in *L.W.*] concluded that an objective "best interests" standard was the appropriate standard to apply when deciding whether to withdraw life-sustaining medical treatment from an incompetent ward in a persistent vegetative state. [*L.W.*, 167 Wis. 2d] at 76, 78, 81. The only thing that matters in the decision-making process is what would be in the ward's best interests.

Majority op. at 566. But the court in *L.W.*, having considered the two cases cited by the majority opinion in the present case, *Pescinski* and *Eberhardy*, stated explicitly that substituted judgment may be the appropriate test in some circumstances:

> [N]either of these cases should be construed to mean that a surrogate decision maker could not make a substituted judgment or decision that was designed to carry out the wishes of the incompetent if the incompetent's wishes were knowable. . . .To hold that all substituted judgments are *ipso facto* rejected would probably constitute an unconstitutional holding for it would deprive an incompetent of the constitutional right of choice—a right that is

> universally recognized when the choice is ascertainable.

*L.W.*, 167 Wis. 2d at 79 n.11. The court has no reason to address the appropriate test in the present case because according to the record Ms. F. was not in a persistent vegetative state and her wishes were not knowable. The majority opinion therefore should not be read to change or add to *L.W.*'s limited statement regarding the appropriate test for a court or guardian to apply in determining the propriety of withholding life-sustaining medical treatment.[5]

¶ 41.   Third, pursuant to *L.W.*, the court's ruling today is limited to Ms. F.'s condition in the spring of 1995. The decision whether to seek additional diagnoses when this case is completed properly belongs to the guardian and not to the court. It is a fundamental premise of *L.W.* that ordinarily decisions to withhold or withdraw life-sustaining medical treatment of a ward are to be made by a guardian in conjunction with doc-

---

[5] For discussions of the substituted judgment and best interests tests see John A. Robertson, *Cruzan and the Constitutional Status of Nontreatment Decisions for Incompetent Patients*, 25 Ga. L. Rev. 1139 (1991); Yale Kamisar, *When is there a Constitutional "Right to Die"? When is there no Constitutional "Right to Live"?*, 25 Ga. L. Rev. 1203 (1991); John A. Robertson, *Assessing Quality of Life: A Response to Professor Kamisar*, 25 Ga. L. Rev. 1243 (1991); Stewart G. Pollock, *Life and Death Decisions: Who Makes Them and By What Standards?*, 41 Rutgers L. Rev. 505 (1989); Nancy K. Rhoden, *Litigating Life and Death*, 102 Harv. L. Rev. 375, 380–419 (1988); Joanna K. Weinberg, *Whose Right Is It Anyway? Individualism, Community, and the Right to Die: A Commentary on the New Jersey Experience*, 40 Hastings L.J. 119 (1988); Rebecca Morgan, *Florida Law and Feeding Tubes—The Right of Removal*, 17 Stetson L. Rev. 109 (1987).

tors and the family, not by the courts. As *L.W.* stated, courts are poorly equipped to handle these matters. *L.W.*, 167 Wis. 2d at 92.

¶ 42. If the guardian chooses to seek further diagnoses and if the doctors, applying current medical knowledge, determine that Ms. F. is at the time of examination in a persistent vegetative state, the guardian may consent to withdrawal of nutrition or the guardian may decide not to withdraw nutrition. In either event, no further circuit court proceeding is available or required unless an interested person objects to the withdrawal of nutrition.

¶ 43. The diagnosis of a persistent vegetative state or its absence is made by qualified physicians using scientifically current information and standards. Guardians and doctors must be allowed to adopt the medical community's most advanced thinking on the subject.[6] It is similarly important that physicians who are called upon to make the apparently difficult diagnosis of a persistent vegetative state be expert in this area of medicine. Court review of the guardian's determination is necessary only if a party in interest objects. *L.W.*, 167 Wis. 2d at 92–93 and n.20.

¶ 44. Fourth, the holding in *L.W.* should be understood to state the principle that the fact that the ward is in a persistent vegetative state is a significant legal threshold.

¶ 45. Under *L.W.* the opinion of an attending physician is essential for the withdrawal of nutrition.

---

[6] Unlike the other concurring opinion I do not believe this court should determine the differences, if any, between the 1994 and earlier medical standards about persistent vegetative state and the appropriate medical diagnosis of persistent vegetative state without the assistance of experts' testimony and without briefing by the parties.

Dr. Erickson, one of the attending physicians, was an internist, had extensive experience with older persons including treating Alzheimer's patients, and held a certificate of added qualifications in geriatrics. While the guardian and guardian ad litem believe that withdrawal of life-sustaining treatment for Ms. F. is appropriate, they relied on the diagnosis of Ms. F.'s attending physicians, as they were required to do under *L.W.*

¶ 46. When the attending physician did not diagnose Ms. F. as in a persistent vegetative state, there was no point in consulting independent physicians. The issue of who should be the independent physicians to diagnose Ms. F.'s condition is thus not raised in this case and has not been briefed by the parties. Furthermore, *L.W.* does not address the difficult question of what procedure should be followed when there is disagreement among the consulted physicians whether the patient is in a persistent vegetative state. Again, this question is not raised or briefed in this case.

¶ 47. To the extent it may be necessary or appropriate for the court to change, add to, or expand upon the standards set forth in *L.W.*, the court should do so only with the benefit of full adversarial briefing in a case presenting a real controversy framed by adversarial parties. *See, e.g., State v. Garfoot*, 207 Wis. 2d 215, 239, 558 N.W.2d 626 (1997) (Bablitch, J., concurring).

¶ 48. I view *L.W.* as the first step in addressing withdrawal of life-sustaining medical treatment from persons in a persistent vegetative state who have not clearly expressed their wishes. As is evident in this case, *L.W.* has not answered all the questions that will be raised in this complex and troubling area. I have tried to take care, however, not to use the present case

581

as the vehicle to offer answers to unresolved complex questions that have been neither raised nor briefed. I am concerned that I not engage in appellate decision making of the sort Attorney Bernard Witkin has characterized as "Have Opinion, Need Case." B.E. Witkin, *Manual on Appellate Court Opinions* § 86 at 155 (1977).

¶ 49.   Fifth, *L.W.* commented favorably on the role of the health care provider's ethics committee.[7] Hospital or nursing home ethics committees provide an important forum for careful deliberation about the decision to withhold life-sustaining medical treatment. Based on the limited record before us, it appears that the committee reviewing the request by Ms. F.'s guardian did not function effectively. Had Ms. F. been in a persistent vegetative state and had an interested person objected to the withdrawal of nutrition, the circuit court stated that it would have been unable to give weight to the committee's purported determination that withholding of nutrition was the ethically proper course. The circuit court noted that no formal minutes or report of the meeting was produced at the hearing and that the committee members apparently functioned without either a shared body of rules or training in ethics. In fairness to the committee members in this case, it must be noted that the committee had only recently been formed and had deliberated in perhaps only one other case.

¶ 50.   The circuit court also seemed troubled, as am I, with the apparent focus of the ethics committee's investigation. The committee seemed to understand

---

[7]*L.W.*, 167 Wis. 2d at 89. For a discussion of the role of ethics committees see Gregory A. Jaffe, *Institutional Ethics Committees: Legitimate and Impartial Review of Ethical Health Care Decisions*, 10 J. Legal Medicine 393 (1989).

that its function was to reach a determination that would insulate the facility from legal liability rather than the determination that best comported with medical ethics.[8] The focus of all participants in this fateful and difficult process should be on the propriety of taking action which will lead to a person's death. The health care facility's liability concerns must not be allowed to interfere with the guardian's efforts to assure the exercise of the ward's right to be free of unwanted life-sustaining medical treatment when the guardian has determined, in consultation with the physicians, that the ward is in a persistent vegetative state and it is in the ward's best interests to withhold such treatment.

¶ 51. For the foregoing reasons I write separately.

¶ 52. WILLIAM A. BABLITCH, J. (*concurring*). The medical determination of the existence of a persistent vegetative state is, literally, one of life or death. It is important the doctors get it right. It is equally important that we get the law right.

---

[8] The ethics committee apparently agreed with the decision to withhold nutrition from Ms. F. but would not agree to carry out this decision without written consent from all family members. It appears that all family members except for one niece of Ms. F. consented in writing. The niece was reported to have said that she did not object to withholding nutrition but that her religious views precluded her from consenting in writing.

The circuit judge concluded his own lengthy questioning of one member of the ethics committee with the following: "[T]he way I understand it, what you really have is a liability problem, and that's why you want everybody to consent, is that correct?" Dr. Erickson answered: "That is correct." R. 19 at 47.

¶ 53. The majority and the concurring opinions, and this writer, agree that if a person is not in a persistent vegetative state, medical treatment cannot be withdrawn.

¶ 54. We further agree that if Ms. F. is diagnosed again and the doctors determine that she meets the current medical definition of persistent vegetative state, medical treatment may be withdrawn even if her physical condition has not changed from the time of the diagnosis rendered in this case.

¶ 55. But then we part company.

¶ 56. Regrettably, the majority and the concurring opinions fail to establish a significant safeguard designed to ensure the accuracy of that determination. They would allow any person with a medical degree to make the critical diagnosis that drives the ultimate decision to withdraw or continue life sustaining medical treatment. Furthermore, they insist on the presence of three doctors only when the decision is to withdraw life sustaining medical support. Respectfully, I cannot join such a decision

¶ 57. I would direct as a matter of law that anytime a guardian requests a diagnosis for the purpose of determining the presence or absence of a persistent vegetative state in order to ascertain whether life sustaining medical treatment can be withdrawn, three conditions must be met. First, the diagnosis must be made by the attending physician and two independent doctors. Second, at least one of the independent doctors must be a specialist in the medical field relevant to the patient's condition.[1] Third, I join with the concurring

---

[1] Although these two issues were neither briefed nor argued by the parties, the posture in which this case comes to us does raise them. It is obvious from this record that all parties agreed to a trial and appellate strategy of attempting to extend *L. W.*.

opinion that the doctors must rely on current medical authority generally accepted in that specialty. Inasmuch as Alzheimer's is a neurological disease, I would direct that in the case of Ms. F. one of the independent doctors be a neurologist relying on current medical authority accepted in the field of neurological medicine.

## I.

¶ 58.   The majority and concurring opinions fail to require that one of the attending physicians be a specialist in the medical field relevant to the patient's condition.

¶ 59.   This case amply demonstrates the need for such protection. Neither of the two physicians who examined Ms. F. were neurologists. The only doctor who was asked his opinion on whether Ms. F. was in a persistent vegetative testified she was not. However, he testified that his diagnosis was based on a January 1989 article in the medical journal, Neurology. The authority he relied on was arguably outdated.

¶ 60.   The entire 1989 Statement upon which the doctor relied covered two pages in that journal. In 1991, the Multi-Society Task Force on Persistent Vege-

Thus, none of the original parties were adversarial to each other, and none of them briefed nor argued these issues. From their perspective, it was unnecessary. Nonetheless, I would reach and decide them. We have on occasion in the past ordered the parties to brief issues not presented in the briefs or arguments. We have, as we did in this very case, appointed counsel to advance opposing positions. I would support similar action in this case. The nature of these issues make it highly unlikely that this court will see them again for years, if ever.

tative State was created.[2] The Task Force's 1994 Statement, a far more exhaustive treatment of persistent vegetative state, summarizes current knowledge of the medical aspects of persistent vegetative state.[3] The 1994 Statement explains, refines and substantially augments the 1989 definition of persistent vegetative state applied by Ms. F.'s doctor in his diagnosis.

¶ 61.   As more fully discussed below, the 1994 Statement appears to call into serious question the accuracy of the diagnosis made by Dr. Erickson.

¶ 62.   Unless this court directs that at least one of the doctors be a specialist current in his or her field, there is nothing to stop this from happening again. The potential for serious error, as possibly occurred here where Ms. F. was diagnosed as not being in a persistent vegetative state, is patent. The potential for serious

[2] The 1994 Statement, *Medical Aspects of the Persistent Vegetative State, Parts I and II*, 330 N.Engl. J. Med. (May 26, 1994), was approved by the executive committee of each of the following medical societies: the American Academy of Neurology, the Child Neurology Society, the American Neurological Association, the American Association of Neurological Surgeons, and the American Academy of Pediatrics. Two representatives from each of these societies were appointed to the Task Force, and an advisory panel of consultants was selected from the related fields of medicine, ethics, and law.

[3] The 1994 Statement speaks to the "vegetative state," distinguishing between a "persistent vegetative state" and a "permanent vegetative state." It refers to the persistent vegetative state as a diagnosis, the permanent vegetative state as a prognosis, i.e., an irreversible persistent vegetative state. *L.W.* used the term persistent vegetative state to refer to an irreversible condition. Because the majority and concurring opinions continue to use the term "persistent" to categorize the irreversible condition, I do likewise.

error in cases involving a patient diagnosed as being in a persistent vegetative is equally apparent.

¶ 63. In retrospect, *L.W.* should have insisted upon, rather than recommended, a specialist in the field. It did not, and the majority and concurring opinions continue in that error. In a justifiable desire to leave these decisions as much as reasonably possible to family members and their physicians and not the courts, the majority and concurring opinions abdicate too much. They are willing to allow any person with a medical degree to diagnose the presence or absence of a persistent vegetative state.

¶ 64. I am not.

¶ 65. A diagnosis of the presence or absence of a persistent vegetative state drives the ultimate decision to withdraw or continue life sustaining medical treatment. It is far too important and critical a decision to leave in the hands of anybody with a medical degree. A level of expertise beyond a medical degree should be demanded.

¶ 66. Other states and commentators have recognized this problem. One legal scholar cites the risk of an erroneous medical diagnosis as one of the three major factors that contribute to the risk of an improper decision to continue or to withhold life sustaining medical treatment. Linda C. Fentiman, *Privacy and Personhood Revisited: A New Framework for Substitute Decision Making for the Incompetent, Incurably Ill Adult*, 57 Geo. Wash. L. Rev. 801, 808 (March 1989). Professor Fentiman notes that a number of courts have implicitly recognized this possibility of a mistaken diagnosis. *Id.* at 809.

¶ 67. The New Jersey Supreme Court, which set the stage for decision making analysis in these cases with the *Quinlan* decision, expressly recognized the

risk of an erroneous diagnosis. *In re Jobes*, 529 A.2d 434, 447–448 (N.J. 1987). To guard against the risk of such an error and to ensure the preservation of medical ethics, the surrogate decision maker must secure statements from "at least two independent physicians knowledgeable in neurology that the patient is in a persistent vegetative state." *Id.* at 448.

¶ 68.   Acknowledging that the prognosis determination is a medical one, the Washington Supreme Court held that even this prong of the life-sustaining medical treatment decision making process must incorporate safeguards to protect patients from an inaccurate diagnosis. *In re Colyer*, 660 P.2d 738, 749 (1983) (requiring confirmation of the attending physician's diagnosis by a prognosis board consisting of "no fewer than two physicians with qualifications relevant to the patient's condition"). *Accord In re Moorhouse*, 593 A.2d 1256 (N.J. App. 1991) (requiring that the attending physician's diagnosis be confirmed by the hospital's prognosis committee and at least two independent physicians knowledgeable in neurology); *John F. Kennedy Memorial Hospital, Inc. v. Bludworth*, 452 So. 2d 921, 926 (Fla. 1984) (requiring certification that patient is in a permanent vegetative state by the primary treating physician and concurrence in the certification by "at least two other physicians with specialties relevant to the patient's condition.").

¶ 69.   The concurring opinion recognizes to some extent these problems by stating that "It is similarly important that physicians who are called upon to make the apparently difficult diagnosis of a persistent vegetative state be expert in this area of medicine." Concurrence at 581.

¶ 70.   It is more than "important." It is critical. I would not recommend, I would direct. The absence of

this safeguard in the majority and concurring opinions charts a perilous course.

¶ 71.   Dr. Erickson, who is not a neurologist, relying on arguably outdated medical authority, diagnosed Ms. F. and testified that she approximates but does not meet the strict definition of persistent vegetative state. If he was in error, important constitutional rights were denied Ms. F. This record raises serious concern in my mind that he may have been in error. At the very least, his testimony did not indicate a knowledge of the 1994 Statement. A neurologist might well have been aware. It might have changed the diagnosis.

¶ 72.   Nevertheless, if there was an error made in the diagnosis of Ms. F., or others like her, it was an error made on the side of life. It can be corrected. Not so in the case of a diagnosis of a persistent vegetative state of a person who is in fact not in a persistent vegetative state. Once medical treatment is withdrawn, life will cease: misdiagnosis in that event cannot be corrected. Surely some minimum safeguards speaking to the expertise and knowledge of the doctors should be present. The majority requires nothing other than a medical degree.

¶ 73.   I would require more.

## II.

¶ 74.   Unfortunately, the majority and concurring opinions require three doctors only when life sustaining support is to be withdrawn. They are silent as to the threshold stage in any case involving these issues: the decision of the guardian to seek a diagnosis.

¶ 75.   I would require three doctors anytime a guardian requests a diagnosis for the purpose of determining the presence or absence of a persistent vegetative state. The importance of that requirement is

demonstrated by this case. Once the attending physician determined that Ms. F. was close but not actually in a persistent vegetative state, the inquiry was ended. But if Ms. F. was incorrectly diagnosed, as I believe is suggested in this record, important constitutional rights were denied her.

¶ 76. We require three doctors when the decision to withdraw life support is made. Is it not equally important to require the same number of doctors at the threshold inquiry which, in a case like this, is determinative of constitutional rights?

¶ 77. I would require that once the guardian determines that the question of withdrawal of life sustaining medical support is presented, the attending physician and two independent doctors must be consulted.

### III.

¶ 78. Fortunately, the concurring opinion recognizes the importance of using current medical authority, and directs that it be used. Concurrence at 580–81 ("If the guardian chooses to seek further diagnoses and if the doctors, *applying current medical knowledge*, determine that Ms. F. is at the time of the examination in a persistent vegetative state, the guardian may consent to withdrawal of nutrition or the guardian may decide not to withdraw nutrition."(Emphasis added.)) *Id.* at 581 ("Qualified physicians make the diagnosis of a persistent vegetative state or its absence, *using scientifically current information and information and standards*." (Emphasis added.)) I join that part of the concurring opinion. Accordingly, that requirement has the support of a majority of this court.

¶ 79. The importance of using current medical authority is amply demonstrated in this record. Dr. Erickson, relying on a January, 1989, journal of neurology, testified that the standards expressed therein required "that there be no behavioral response *whatsoever* over an extended period of time." (Emphasis added.) Further, he testified that those 1989 standards required there be "no voluntary action or behavior *of any kind* [present]." (Emphasis added.) Because there was "some minimal response to stimulation from her surroundings" the doctor concluded Ms. F. "approximates but does not entirely meet that definition of the persistent vegetative state."

¶ 80. This testimony was crucial. No one disputed the doctor's finding that Ms. F. was not in a persistent vegetative state. The circuit court had no choice but to agree. But current medical authority, the 1994 Statement, contradicts or at the very least calls into serious question Dr. Erickson's conclusion. It does not require "no behavioral response whatsoever" for the presence of a persistent vegetative state; rather, it requires no evidence of "sustained" behavior of that kind.

¶ 81. In order to more fully understand why the 1994 Statement seriously undercuts the doctor's conclusion, it is necessary to first understand more completely the condition of Ms. F. with respect to her response to stimulation.[4]

---

[4] I agree with the concurring opinion that the majority opinion does not convey an accurate picture of Ms. F.'s condition. The facts recited in the concurring opinion together with the facts stated herein convey an accurate portrayal. In addition, I note that Ms. F. has been in this condition since 1993, and her doctors testify she will not improve, she will only get worse.

¶ 82. Although she appears to respond to voices or noises in her room, she makes no meaningful response to questions or commands. R:19 at 24–25.[5] Several medical professionals who had regular contact with Ms. F. described her condition. Licensed practical nurse, Patricia Rohmeyer (Rohmeyer), has had regular contact with Ms. F. since 1986. R:19 at 6. Rohmeyer testified that she "[d]oes not respond most of the time when you speak to her, either by blinking her eyes or opening her eyes." R:19 at 7. Edna F. does not respond when Rohmeyer places a finger in her hand and asks her to squeeze the finger. R:19 at 8. When asked whether Ms. F. looked toward a person who called her name, Rohmeyer responded that "[s]he wasn't able to today." R:19 at 8. She described Ms. F.'s condition as "progressive through the years." R:19 at 8.

¶ 83. Spahn described her sister's condition to the circuit court: "Sometimes I can get her to look at me. . . .Sometimes I can get her to look. Not very often. The last couple times I have been in I've gotten—I did get her to open her eyes, but not to look at me." R:19 at 75–76.

¶ 84. Even more telling was the testimony of Dr. Erickson. He described Ms. F.'s condition on December 19, 1994:

> She did respond to voice by opening her eyes, but did not respond to command. . . .She opened her eyes and looked, but not in any meaningful way at me. She simply appeared to respond to a voice or to a noise in the room. I discussed with the nursing staff at that time, although I did not notice that she would occasionally track movement in the room. The level of alertness that I found at that time in

---

[5] References are to pages and documents in the record.

discussion with the nursing staff was consistent with what they had observed on a day to day basis. . . .Periodically she would follow movement in the room, or she may respond to tactile stimulation or voice by opening her eyes. But there was no meaningful response to command or attempts at communication.

R:19 at 24–25.

¶ 85. The record reveals that upon application of mildly noxious stimuli, Ms. F. might open her eyes or grimace but, her doctors say, she fails to make a consistent effort to withdraw from or to remove the stimulation. R: 19 at 26, 65.

¶ 86. Dr. Przyblinski described Ms. F.'s response to mildly noxious stimuli: "When I gave her tactile stimulation which I considered mildly noxious, either pinching her for arm [sic] or her leg or rubbing her sternum, she grimaced and she did make a moaning sound. She did not make any attempt to push my hand away or pull her arm or leg away, *so I didn't see anything that I would see as purposeful movement with that kind of stimulation.*" R:19 at 63. He further states that she is no longer aware of, nor can she interact in any purposeful manner, with her surroundings, or the people who are attending to her. R:19 at 64–65 (emphasis added).

¶ 87. Dr. Erickson has never observed a consistent effort by Ms. F. to withdraw from noxious stimuli. R:19 at 25. When he touches her face, or presses gently on her sternum, she might make a minimal response, i.e., a movement or facial expression, acknowledging the stimulation, but he has observed no consistent effort to withdraw or to remove the stimuli. R:19 at 26. When doctors subject her to noxious stimuli, Ms. F.'s vital signs remain stable. R:19 at 34.

¶ 88. The 1994 Statement lists the following criteria according to which the vegetative state can be diagnosed:

(1) no evidence of awareness of self or environment and an inability to interact with others; (2) no evidence of sustained, reproducible, purposeful, or voluntary behavioral responses to visual, auditory, tactile, or noxious stimuli; (3) no evidence of language comprehension or expression; (4) intermittent wakefulness manifested by the presence of sleep-wake cycles; (5) sufficiently preserved hypothalamic and brain-stem autonomic functions to permit survival with medical and nursing care; (6) bowel and bladder incontinence; and (7) variably preserved cranial-nerve reflexes (pupillary, oculocephalic, corneal, vestibulo-ocular, and gag) and spinal reflexes.

¶ 89. Dr. Erickson testified that a persistent vegetative state required "no behavioral response whatsoever." As seen from the above 1994 Statement, that appears to be an incorrect conclusion: "no evidence of *sustained*, reproducible, or voluntary behavioral responses to. . .stimuli." (Emphasis added.) The 1994 Statement further cautions that motor or eye movements and facial expressions in response to various stimuli also occur in persons in an irreversible vegetative state. These movements and expressions occur in stereotyped patterns that indicate reflexive responses integrated at deep subcortical levels, and are not indicative of learned voluntary acts. The presence of these responses is consistent with complete unawareness. The 1989 Statement does not discuss the subtle distinctions between the visual pursuit of a person who is aware of the surroundings and a person in a persistent vegetative state.

¶ 90. Given that Dr. Erickson believed the existence of a persistent vegetative state required no behavioral response whatsoever, given that he testified Ms. F.'s responses were "minimal," and given the above quoted texts from the 1994 Statement, I conclude a serious question exists as to the accuracy of his diagnosis. If so, important constitutional rights have been denied Ms. F. The use of current medical authority might well have changed his diagnosis. Fortunately, that is now the mandate of this court.

¶ 91. In summation, I would hold that anytime a guardian requests a diagnosis for the purpose of determining the presence or absence of a persistent vegetative state to ascertain whether life sustaining medical treatment may be withdrawn, three conditions must be met: 1) the diagnosis must be made by the attending physician together with two independent doctors; 2) at least one of the independent doctors must be a specialist in the medical field relevant to the patient's condition; and, 3) the diagnosis must rely on current medical authority generally accepted in that specialty.

¶ 92. If indeed Ms. F.'s original diagnosis was incorrect, needless suffering has been endured by her family and loved ones as they have been forced to sit helplessly by watching this woman they love continue an emptiness that only the most literal would call life. Had the procedures I recommend been utilized, this might have been avoided. Fortunately, if error has been made it can be corrected. All members of this court agree that she can be re-diagnosed. If her attending physician and two independent doctors agree that she meets the current medical definition of persistent vegetative state, and no one objects, medical treatment may be withdrawn without further recourse to the

courts. This is so even if her physical condition has not changed from the time of the original diagnosis rendered in this case.

¶ 93. Others may not be as fortunate.

¶ 94. For the above stated reasons, I respectfully concur.[6]

¶ 95. JANINE P. GESKE, J. (*concurring*). I join both the majority opinion authored by Justice Donald W. Steinmetz and the concurring opinion authored by Chief Justice Shirley S. Abrahamson.

¶ 96. ANN WALSH BRADLEY, J. (*concurring*). I join both the majority opinion authored by Justice Donald W. Steinmetz and the concurring opinion authored by Chief Justice Shirley S. Abrahamson.

---

[6] I also agree with the concurring opinion with respect to its discussion of what *L.W.* does and does not stand for, specifically that the provision of nutrition and hydration by artificial means are forms of medical treatment in Wisconsin, and that the substituted judgment test has not been rejected in Wisconsin in all circumstances.