STATE of Wisconsin, Plaintiff-Respondent,

v.

Jerry J. WINTLEND, Defendant-Appellant.†

Court of Appeals

*No. 02–0965–CR. Submitted on briefs September 24, 2002.—
Decided November 6, 2002.*

2002 WI App 314

(Also reported in 655 N.W.2d 745.)

† Petition to review denied 1-14-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ralph A. Kalal* of *Kalal & Associates* of Monona.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Phillip A. Koss*, district attorney.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J.   Jerry J. Wintlend appeals his conviction for operating a motor vehicle while intoxicated. He contends that when he was read the Informing the Accused form by the officer following his arrest, the language of that form contained a threatened sanction of a loss of driving privileges unless he consented to taking a blood alcohol test. He maintains that this threat constituted a coercive measure invalidating his consent for Fourth Amendment purposes. *See* Wis. Stat. § 343.305 (1999–2000).[1] In *Village of Little Chute v. Walitalo*, 2002 WI App 211, 256 Wis. 2d 1032, 650 N.W.2d 891, *review denied,* 2002 WI 121 (Wis. Sept. 26, 2002) (No. 01–3060), our court had the same issue before it, but Wintlend maintains that while noting the

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

issue, the *Walitalo* court did not address it. To the extent that the *Walitalo* court did not address the argument Wintlend now makes, we speak to that argument and reject it.

¶ 2. On February 17, 2001, Wintlend was arrested for operating a motor vehicle while intoxicated. The Informing the Accused form was read to him and he consented to taking a blood alcohol test. His blood alcohol measured .183% and he was therefore also charged with a prohibited blood alcohol concentration. Prior to trial, he moved to suppress the evidence, contending, inter alia, that any implied consent to have blood taken from him was a coerced consent by operation of the penalty structure of Wis. Stat. § 343.305(2) and design of the companion provisions of that statute, and was thereby constitutionally invalid. The trial court denied the motion and Wintlend pled no contest to operating while intoxicated. The prohibited blood alcohol concentration charge was dismissed and read in. Wintlend was sentenced and he appeals, again raising the coercion issue.

¶ 3. This precise issue was before the court in *Walitalo*. In that case, the court observed that the presence or absence of actual coercion or improper police practices is the focus of inquiry because it is determinative on the issue of whether the consent was the product of a "free and unconstrained will, reflecting deliberateness of choice." *Walitalo*, 2002 WI App 211 at ¶ 9 (citation omitted). The court noted that the arresting officer did not threaten or apply any coercion, but simply read the Informing the Accused form, which stated the truth: if Walitalo refused to submit, his driving privileges could be revoked. *Id.* at ¶ 11. The court further noted that the statement did not involve

trickery or deceit, but merely informed him of his legal situation. *Id.* Because there was no actual coercion, the court concluded that Walitalo's consent was voluntary. *Id.*

¶ 4. When Wintlend wrote his brief-in-chief, *Walitalo* had not been released. By the time of his reply brief, it had been ordered published. Thus, in his reply brief, Wintlend discussed the impact of *Walitalo* as it related to his case. For some strange reason, he first submitted that the *Walitalo* court did not reach whether the implied consent statute, when read to the accused, is a form of coercion because the court held that the attorney general had not been notified. Our review of *Walitalo* shows that the court made no such holding.

¶ 5. Later in the reply brief, Wintlend apparently changed course and allowed that the court had, in fact, addressed the issue but claimed that the court missed it. Wintlend wrote, in pertinent part: "The predicate of this Court's opinion in *Walitalo* is that the statement in the 'Informing the Accused' is accurate . . . . *Walitalo* says there is no coercion in correctly stating options, assuming that the options are Constitutional." Wintlend then went on to argue that the options are unconstitutional because they force a motorist to make a choice—either take the test or lose one's license. Wintlend appears to maintain that this state-sponsored coercion exerts a psychological toll on motorists at the time the motorists are asked to take the blood alcohol test, overbearing their will and compelling them to consent to taking a test. In Wintlend's view, the consent obtained after the police officer reads the Informing the Accused form is neither the product of an essentially free will nor an unconstrained choice.

¶ 6.   First, Wintlend is wrong when he argues, as he seemingly does, that the *Walitalo* court missed the issue. It did not. The court reasoned that in reviewing claims of coercion, the focal point must be the "presence or absence of actual coercion." *Id.* at ¶ 9. The court pointed out that when an officer informs a motorist that his or her driving privileges may be revoked if that motorist refuses to take a blood alcohol test, that information is true. *Id.* at ¶ 11. Because the officer was merely providing truthful information and because the officer made no threats or applied any coercion, the court could not find that any coercion existed. The court held that there is no unlawful coercion where the officer merely informs the arrestee of the permissible range of sanctions that the State may ultimately be authorized to impose. *See id.* at ¶¶ 6, 11. We conclude that the *Walitalo* court saw the issue from the standpoint of the officer's actions and, as so viewed, did answer the issue before the court.

¶ 7.   But, here, Wintlend argues that it is not the officer's actions that matter. Rather, he contends, it is the statute itself which should be the subject of a coercion analysis. We note that his counsel has raised this same issue, even after *Walitalo*, in numerous appeals across the state. If, for no other reason than to finally put an end to the constant barrage of appeals all raising this same issue, we will indulge Wintlend and answer the issue he now raises post-*Walitalo*.

¶ 8.   Wintlend appears to be arguing that the implied consent law conditions receipt of one constitutional right (the right to travel) in return for the relinquishment of another constitutional right (the Fourth Amendment right to be free from governmental searches and seizures). He posits that a license, once granted by the State, is a constitutionally protected

interest. He asserts that giving up the right of privacy to one's own body in return for keeping the right to drive is coercive because it poses a choice between two evils—allow a search of one's body by someone else or lose the right to drive without due process.

¶ 9. We have two responses to this argument. First, while there is a constitutional right to travel, there is no constitutional right to operate a motor vehicle. *County of Fond du Lac v. Derksen*, 2002 WI App 160, ¶ 7, 256 Wis. 2d 480, 647 N.W.2d 922, *review denied*, 2002 WI 121 (Wis. Sept. 3, 2002) (No. 01–2870). So, it is not true that the statute presumes to have a motorist give up one right in order to obtain another. What the motor vehicle operator's license does for motorists is extend to them a benefit—the privilege to drive on our highways. Second, the United States Supreme Court has never interpreted the Fourth Amendment as imposing an absolute prohibition of state measures calling upon individuals to abandon their rights as a prerequisite to the receipt of governmental benefits and privileges. In fact, the Court has reached just the opposite conclusion. In *Zap v. United States*, 328 U.S. 624, 628 (1946), a case dealing with government contracts, the Court recognized that individuals may validly waive their Fourth and Fifth Amendment rights as a condition of receiving government business contracts.

¶ 10. It therefore follows that the conditioning of benefits upon the surrender of a right does not automatically lead to a finding of unconstitutionality. In the Fourth Amendment context, only unreasonable governmental intrusions are constitutionally proscribed. *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Thus, the real question is not whether access to the highways by

virtue of a driver's license is conditioned upon a surrender of a right, but whether the Fourth Amendment intrusion it authorizes is independently reasonable. *See Wyman v. James*, 400 U.S. 309, 318 (1971).

¶ 11.  In assessing the reasonableness of the coercive nature of the implied consent statute, we first acknowledge that coercion and duress need not be based on some act by the government which is physical or brutal in nature to vitiate consent. *See Haynes v. Washington*, 373 U.S. 503, 513 (1963). Psychological compulsion may, in appropriate cases, operate to overcome American values of freedom of choice, individual liberty and personal autonomy. *See id.* Thus, we must look to see whether the implied consent law employs any unreasonable psychological compulsion upon motorists in this state. The answer to this question is in two parts. First, we must consider the question of "when" the consent is obtained. Then, having answered that, we must consider whether "the circumstances" by which the consent was gained are compatible with our sense of reasonableness.

¶ 12.  We begin our analysis with the truism that no one forces anyone in this state to get a driver's license. Individuals have the freedom to choose whether and when to drive on our highways. However, in return for seeking the privilege of driving on our highways, the would-be motorist must obtain a valid driver's license. As a condition of obtaining a driver's license, the would-be motorist must be willing to accept the burdens associated with this choice. One of these conditions is to obey the traffic laws of this state. Another condition is that if the person needs glasses or contacts to drive, the person must agree that he or she will wear

883

glasses or contacts. And, pertinent to this case, our supreme court has declared that when a would-be motorist applies for and receives an operator's license, that person submits to the legislatively imposed condition that, upon being arrested for driving while under the influence, he or she consents to submit to the prescribed chemical tests. In *State v. Neitzel*, 95 Wis. 2d 191, 193, 289 N.W.2d 828 (1980), the court wrote:

> By reason of the implied consent law, a driver, when he applies for and receives an operator's license, submits to the legislatively imposed condition on his license that, upon being arrested and issued a citation for driving under the influence of an intoxicant, contrary to sec. 346.63 (1), Stats., he consents to submit to the prescribed chemical tests. He applies for and takes his license subject to the condition that a failure to submit to the chemical tests will result in the sixty-day revocation of his license unless the refusal was reasonable.

■

¶ 13.   Thus, our supreme court has decided that the time of consent is when a license is obtained. As such, it stands to reason that any would-be motorist applying for a motor vehicle license is not coerced, at that point in time, into making the decision to get a license conditioned on the promise that if arrested for drunk driving, the motorist agrees to take a test or lose the license. The choice is there. If the would-be motorist decides to dissent, he or she does not have to get a license to exercise the constitutional right to travel. *See Derksen*, 2002 WI App 160 at ¶ 7. The person can take a bus, ride a bike, or walk. Thus, there is no psychological pressure brought to bear at the time that a motorist applies for and obtains a driver's license in exchange for accepting the burdens imposed by the State.

¶ 14.   Of the fifty-two cases cited by Wintlend in his brief-in-chief, he does not acknowledge the language contained in *Neitzel*, much less cite the case at all. Rather, he argues that the time when consent to take the test occurs and the time when the coercion rears its head is when a law enforcement officer reads the Informing the Accused form to the accused motorist. Wintlend needs us to find a different time frame for when consent is gained so that he can then argue that the real moment when psychological pressure is brought to bear is when the Informing the Accused form is read. As we already noted, the argument that consent comes at some time different from the time a person applies for and obtains the license is directly contrary to the specific language found in *Neitzel*. As Wintlend must know, we may not overrule the supreme court. The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case. *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997).

¶ 15.   For the sake of argument, let us suppose that *Neitzel* did not contain the language we have cited. Let us indulge Wintlend in his argument. He cites Wis. Stat. § 343.305(2), which says, in pertinent part: "Any person who . . . drives or operates a motor vehicle upon the public highways . . . is deemed to have given consent." Wintlend argues that the legislature has thus decreed that consent is obtained when the person has actually driven on the highway, not at some time beforehand. He apparently further argues that the statute is addressing the motorist in "real-time," after arrest when being read the Informing the Accused form, not before. And while he has not made the argument, one could assert that the language in *Neitzel*

weakens when it is observed that out-of-state drivers would not fit nicely into the *Neitzel* court's analysis.

¶ 16. We could quibble with Wintlend's statutory construction analysis. We could say that what is wrong with Wintlend's reasoning is that the legislature did not put that language in the present tense as if to say that the person "gives consent" each time he or she decides to drive. Rather, the legislature said that the person "is deemed to have given consent." Wis. Stat. § 343.305(2). That wording implies that the consent antecedes the operation of the vehicle. Our construction would be consistent with the language contained in *Neitzel*. Or we could read the statute to say that the statute says nothing about consent being obtained at the time the form is read; at the most, it says that any time a person drives a motor vehicle on our highways, at that time, consent is obtained. Either construction would doom Wintlend's argument.

¶ 17. But more to the point, even if the time of the coerced event is at the time when the Informing the Accused form is read to the accused motorist, the question remains whether the coercive event is reasonable. Both the United States Supreme Court and our supreme court have recognized that a blood alcohol test is safe, relatively painless and commonplace. *South Dakota v. Neville*, 459 U.S. 553, 563 (1983); *State v. Krajewski*, 2002 WI 97, ¶ 57, 255 Wis. 2d 98, 648 N.W.2d 385. Taking one of the three tests authorized by statute is not an intrusive measure when compared with other, much more intrusive state actions. For example, it is much less intrusive than forcing a person to disgorge the contents of his or her stomach as was the case in *Rochin v. California*, 342 U.S. 165, 166–67 (1952). We therefore conclude that the bodily intrusion

the motorist is being asked to allow, in return for retaining the license to drive, is a minimal one. It is not a hard, unconscionable choice the motorist is being asked to make.

¶ 18.   And what does the State get in return for this minimal intrusion? The United States Supreme Court has long recognized a state's desire to detect, eliminate and prevent certain hazardous conditions to public health as sufficiently compelling to justify the intrusion on privacy occasioned by suspicionless searches or seizures. *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668 (1989) ("Our precedents have settled that, in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion."). If such is the case with suspicionless activity, imagine the government's right when there is not only suspicion, but probable cause. Intoxicated driving on our highways is a hazardous condition to public health. The high volume and inherent mobility of motor vehicles indicates that the threat by intoxicated drivers is very real. Thus, there is a compelling need to get intoxicated drivers off the highways and keep them off until they have, hopefully, learned their lesson. The implied consent law is for a compelling purpose and is not overly intrusive. It is not unreasonable. Therefore, at whatever point the motorist is coerced into making a decision, be it at the time the person applies for and obtains a license, or when the person begins operating the vehicle on each particular occasion, or after arrest, the statute's coerciveness is not unreasonable.

¶ 19. In closing, we observe that long after the motorist obtains his or her license, the motorist still has choices. There is a choice about whether to drink and drive, for example. The motorist may decide to get behind the wheel and drive or may decide not to do so. But common sense and human experience tell us that a motorist knows that immoderate consumption and driving a motor vehicle is not met with favor. Knowing this information, the motorist nonetheless maintains the freedom to decide whether to drive. If the motorist makes the choice to drive, but is stopped and arrested, the motorist's plethora of choices is whittled down to one self-induced Hobson's choice—take the test or lose the license to drive. It is the motorist who has voluntarily asserted his or her autonomy, which freedom of choice has put the motorist, as Justice Sutherland put it, "between the rock and the whirlpool." *See Frost v. R.R. Comm'n,* 271 U.S. 583, 593 (1926). As one commentator noted, "[i]t would be paradoxical indeed for individuals to claim that they were coerced into making a decision (thus escaping the consequences thereof) that is compelled by a predicament in which they willingly placed themselves ab initio." Eustace T. Francis, *Combatting the Drunk Driver Menace: Conditioning the Use of Public Highways on Consent to Sobriety Checkpoint Seizures—The Constitutionality of a Model Consent Seizure Statute,* 59 ALB. L. REV. 599, 656 (1995). Thus, even if the coercive event takes place at the time the Informing the Accused form is read to the accused motorist, it is an entirely reasonable form of coercion. We therefore reject Wintlend's argument.

*By the Court.*—Judgment affirmed.