Nancy MONTALVO, Brian Vila, and Emanuel L. Vila, by his Guardian ad Litem, Timothy J. Aiken, Plaintiffs-Appellants,†

BLUE CROSS BLUE SHIELD UNITED OF WISCONSIN, Wisconsin Division of Health Care Finance, and Primecare Health Plan, Inc., Involuntary Plaintiffs,

v.

Terre BORKOVEC, M.D., Defendant,

Brent W. ARNOLD, M.D., Jonathan H. Berkoff, M.D., St. Mary's Hospital of Milwaukee, Wisconsin Patients Compensation Fund, and Physicians Insurance Co. of Wisconsin, Defendants-Respondents.

Court of Appeals

*No. 01–1933. Submitted on briefs March 28, 2002.—Decided May 29, 2002.*

2002 WI App 147

(Also reported in 647 N.W.2d 413.)

On behalf of the plaintiffs-appellants, the cause was submitted on the brief of *Timothy J. Aiken* and *James C. Gallanis* of *Aiken & Scoptur, S.C.*, Milwaukee.

On behalf of the defendant-respondent Wisconsin Patients Compensation Fund, the cause was submitted on the brief of *John F. Mayer* and *Jeremy T. Gill* of *Nash, Spindler, Grimstad & McCracken LLP*, Manitowoc.

On behalf of the defendant-respondent Brent W. Arnold, M.D., the cause was submitted on the brief of *Michael P. Malone* and *Pamela J. Tillman* of *Hinshaw & Culbertson*, Milwaukee.

On behalf of the defendant-respondent Jonathan H. Berkoff, M.D., the cause was submitted on the brief of *Linda E.B. Hansen* of *Nilles & Nilles, S.C.*, Milwaukee.

On behalf of the defendant-respondent St. Mary's Hospital of Milwaukee, the cause was submitted on the brief of *Marilyn M. Carroll* of *Kravit, Gass, Hovel & Leitner, S.C.*, Milwaukee.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. WEDEMEYER, P.J.   Nancy Montalvo, Brian Vila and Emanuel L. Vila (by his guardian ad litem, Timothy J. Aiken) appeal from judgments entered after the trial court dismissed their complaint against Dr. Brent W. Arnold, Dr. Jonathan H. Berkoff, St. Mary's Hospital of Milwaukee, the Wisconsin Patients Compensation Fund and Physicians Insurance Co. of Wisconsin. The complaint alleged that the defendants were negligent for failing to sufficiently inform Montalvo and

Vila of the risk of disability to Emanuel following his premature birth by cesarean section.

¶ 2.   Montalvo, Vila, and Emanuel raise ten arguments.[1] We address only those arguments necessary to the resolution of this case. Because under our current rules of pleading and procedure, substantive law, and public policy the plaintiffs' claims cannot be pursued, we affirm.

## I. BACKGROUND

¶ 3.   On November 21, 1996, Montalvo entered St. Mary's Hospital in Milwaukee, Wisconsin, with preterm labor symptoms. An ultrasound revealed that the baby was 23 and 3/7 weeks old, and weighed 679 grams. Attempts to interrupt her labor and delay the birth were unsuccessful. Prior to delivery of the child, the parents executed an informed consent agreement for a cesarean procedure.

---

[1] They argue:   (1) Montalvo had a right to informed consent prior to the cesarean procedure; (2) the decision to use potentially harmful therapy is subject to informed consent; (3) Wisconsin abortion law does not apply to this situation; (4) with the exception of the drug/alcohol abuse provisions of ch. 48, expectant mothers have the absolute right to control the manner of delivery; (5) the concept of "viability" cannot mean preservation of life at any cost; (6) the lifelong ramifications of perinatal treatment decisions mandate that such decisions be made by the parents only after being fully informed of all the risks and alternatives; (7) federal funding statutes do not control Wisconsin informed consent law; (8) the Americans with Disabilities Act does not control this case; (9) there is no constitutional basis for federal or state government interference in the medical decision-making process; and (10) compelling parents to agree to surgeries or therapies whose benefit versus risk analysis is unclear puts an unfair burden on parents.

¶ 4. Dr. Terre Borkovec performed the cesarean section. At birth, Emanuel was "handed off" to Dr. Arnold, a neonatologist, who successfully performed life-saving resuscitation measures.

¶ 5. On November 19, 1999, Montalvo filed a complaint against Borkovec and Arnold alleging that both physicians violated the informed consent statute, WIS. STAT. § 448.30, in performing the cesarean section. The complaint also alleged that Arnold, Berkoff, and St. Mary's Hospital were negligent for violating the same informed consent statute when they performed "life-saving measures" for Emanuel. The complaint alleged that because the physicians failed to advise the parents of "the risks or potential consequences of a child born at 23 or 24 weeks gestation and/or with a birth weight of less than 750 grams," consent was not informed and a variety of damages resulted.

¶ 6. Berkoff, Arnold, and St. Mary's Hospital moved to dismiss the claims contending that the complaint failed to state a claim upon which relief could be granted pursuant to WIS. STAT. § 802.06(2)(a)6. During a hearing on the motions, and prior to rendering a decision, the trial court ascertained that the plaintiffs were not alleging harm to Emanuel as the result of "extraordinary care measures" but were claiming that the decision to use "extraordinary care measures" should have been relegated to them as parents rather than left to the physicians. Lastly, the plaintiffs were not alleging that Emanuel was disabled by any actions taken by the physicians or St. Mary's Hospital.

¶ 7. The trial court dismissed the complaint ruling first that the only claim pled for a violation of the informed consent statute in performing the cesarean

section was against Arnold.[2] Because, however, he was only a bystander to the delivery, he was not required under the statute to provide informed consent because he did not perform the procedure. Second, the trial court ruled that Wisconsin law does not leave the resuscitation decision upon the birth of a child solely to the parents because of the community's interest in protecting children, and the physicians' commitment to preserving life. Montalvo now appeals.

## II. ANALYSIS

### *Standard of Review*

¶ 8.    A motion to dismiss a complaint for failure to state a claim upon which relief may be granted tests the legal sufficiency of the pleading. *Evans v. Cameron*, 121 Wis. 2d 421, 426, 360 N.W.2d 25 (1985). As a question of law, we review the trial court's decision independently, keeping in mind the value we accord the trial court's analysis. We must affirm a judgment dismissing a complaint for failure to state a claim if, upon review of the complaint, as liberally construed, it is quite clear that under no conditions can the plaintiff recover based upon the facts alleged and inferences reasonably drawn. *Bartley v. Thompson*, 198 Wis. 2d 323, 332, 542 N.W.2d 227 (Ct. App. 1995). With these rubrics of review in mind, we now examine the issues dispositive of this appeal.

[2] For reasons undisclosed in the record, Dr. Terre Borkovec was voluntarily dismissed from the action.

## A. *Rules of Pleading and Procedure.*

■

¶ 9.    The original defendants in this case were Drs. Borkovec, Arnold, Berkoff and St. Mary's Hospital. Borkovec, who performed the cesarean section, was voluntarily dismissed from the case. That left Arnold as the only target allegedly negligent for failure to obtain a properly informed consent for the performance of the cesarean section. Yet, it was undisputed that Arnold, although present when the cesarean section occurred, did not participate in the procedure. The trial court construed WIS. STAT. § 448.30 to provide that only the treating physician, here Borkovec, owed the responsibility of informed consent to the parents. Borkovec, however, was no longer a party to the action. The statute does not impose the duty of informed consent on non-treating physicians. Because Arnold neither participated nor assisted, he was not a treating physician with respect to the cesarean procedure, and did not have a duty to comply with the informed consent statute.

¶ 10.    Thus, the trial court concluded that with respect to the cesarean procedure, no claim had been properly pleaded upon which relief could be granted. We know of no authority to the contrary. In this respect, the trial court did not err. On appeal, Montalvo has not contested this ruling. Consequently, the only claims remaining to be addressed by the trial court were the failure to properly obtain informed consent relating to resuscitation efforts by Arnold, Berkoff, and St. Mary's Hospital.

## B. Substantive Law and Statutory Law.

¶ 11. On the remaining informed consent issue relating to the resuscitation efforts, the essential question is whether the complaint states a legally cognizable claim against the remaining defendants. The trial court ruled it did not.

¶ 12. Our informed consent law requires a physician to disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis. *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 329, 552 N.W.2d 869 (Ct. App. 1996). It is a right found in both the common law of this state and in statutory provisions. WISCONSIN STAT. § 448.30 codified the duty-to-disclose law recognized by *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 13, 227 N.W.2d 647 (1975), and reads:

> **Information on alternate modes of treatment.** Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
> **(1)** Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> **(2)** Detailed technical information that in all probability a patient would not understand.
>
> **(3)** Risks apparent or known to the patient.
>
> **(4)** Extremely remote possibilities that might falsely or detrimentally alarm the patient.

**(5)** Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

**(6)** Information in cases where the patient is incapable of consenting.

¶ 13. The statute is basically divided into two parts: what information a treating physician is obligated to convey to a patient and what information he/she need not convey. The plain language of the statute places an obligation on a physician to provide information only about available and viable options of treatment.

■

¶ 14. In addressing the obligatory first part of the statute, our supreme court has declared: "[W]hat a physician must disclose is contingent upon what, under the circumstances of a given case, a reasonable person in the patient's position would need to know in order to make an intelligent and informed decision." *Johnson v. Kokemoor*, 199 Wis. 2d 615, 639, 545 N.W.2d 495 (1996). Restricting the application of the obligation, we declared in *Mathias v. St. Catherine's Hospital, Inc.*, 212 Wis. 2d 540, 569 N.W.2d 330 (Ct. App. 1997): "The law in Wisconsin on informed consent is well settled . . . . the duty to advise a patient of the risks of treatment lies with the doctor . . . . The court was explicit in pointing out that the duty to obtain informed consent lay with the doctor, not the hospital." *Id.* at 548 (citations omitted).[3] Thus, St. Mary's Hospital was not a proper

---

[3] The dismissal of St. Mary's Hospital at the complaint stage has not been addressed by the plaintiffs. We therefore deem the issue abandoned. *See Reiman Assocs. v. R/A Adver. Inc.*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292 (Ct. App. 1981).

defendant. We continue the analysis then only as the second claim applies to Arnold and Berkoff.

¶ 15.  Doubtless, the doctrine of informed consent comes into play only when there is a need to make a choice of available, viable alternatives. In other words, there must be a choice that can be made. The process of decision-making necessarily implies assessing and selecting an available alternative. In the context of treatment required after the cesarean procedure was performed on Emanuel, there are two reasons why no available, viable alternative existed to give rise to the obligation to engage in the informed consent process.

¶ 16.  First, requiring the informed consent process here presumes that a right to decide not to resuscitate the newly born child or to withhold life-sustaining medical care actually existed. This premise is faulty. In *Edna M.F. v. Eisenberg*, 210 Wis. 2d 557, 568, 563 N.W.2d 485 (1997), our supreme court set forth the preconditions required for permitting the withholding or withdrawal of life-sustaining medical treatment. There, the appointed guardian of her incompetent sister, Edna, sought permission to direct the withholding of medical care from Edna even though she was not in a persistent vegetative state. *Id.* at 559–60. She claimed that Edna would not want to live in her condition, completely dependent on others for her care and existence, non-responsive and immobile. *Id.* at 560–61. The court, in refusing to extend the right to refuse life-sustaining medical treatment beyond individuals in a persistent vegetative state, relied on the analysis of the United States Supreme Court in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990):  "[W]e think a State may properly decline to make judgments about the 'quality' of life that a par-

ticular individual may enjoy, and simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interests of the individual." *Edna M.F.*, 210 Wis. 2d at 563 (quoting *Cruzan*, 497 U.S. at 282).

¶ 17. The *Edna* court, in examining the sensitive issues before it and the need to balance the interests of the individual versus those of the state, was quick to appreciate the consequences of ultimate decisions made by third-party surrogates for those who cannot speak for themselves. It thus concluded that either withholding or withdrawing life-sustaining medical treatment is not in the best interests of any patient who is not in a persistent vegetative state. *Edna M.F.*, 210 Wis. 2d at 566–68. Thus, in Wisconsin, in the absence of a persistent vegetative state, the right of a parent to withhold life-sustaining treatment from a child does not exist. It is not disputed here that there was no evidence that Emanuel was in "a persistent vegetative state." Accordingly, the alternative of withholding life-sustaining treatment did not exist.

¶ 18. The second reason why a viable alternative did not exist to trigger informed consent is the existence of the United States Child Abuse Protection and Treatment Act (CAPTA) of 1984, Pub. L. No. 98–457, 98 Stat. 1749 (codified at 42 U.S.C. § 5101 et. seq.). Because Wisconsin has fulfilled the necessary obligations to receive federal funds under CAPTA, CAPTA and its regulations are fully applicable in this state. *Jeanine B. v. Thompson*, 967 F. Supp. 1104, 1111–12, 1118 (E.D. Wis. 1997).

¶ 19. CAPTA was enacted to establish eligibility for states to obtain federal funding for the prevention of

child abuse and to develop and implement a successful and comprehensive child and family protection strategy. Under CAPTA, states must have in place procedures for responding to child neglect. 42 U.S.C. § 5106(b)(4)(C). The Act includes a provision preventing "the withholding of medically indicated treatment from a disabled infant with a life-threatening condition." 45 C.F.R. § 1340.15(b)(1). In the regulations enacted under the statute, "withholding of medically indicated treatment" is defined as "the failure to respond to the infant's life-threatening conditions by providing treatment . . . which, in the treating physician's . . . reasonable medical judgment, will be most likely to be effective in . . . correcting all such conditions . . . ." 45 C.F.R. § 1340.15(b)(2). The regulations further include the "authority to initiate legal proceedings . . . to prevent the withholding of medically indicated treatment from disabled infants with life-threatening conditions." 45 C.F.R. § 1340.15(c)(2)(iii). The implied choice of withholding treatment, proposed by the plaintiffs, is exactly what CAPTA prohibits.

¶ 20. It is noteworthy that in the complaint, plaintiffs did not allege that Emanuel was born with a known disability or that they would have chosen to withhold life-sustaining treatment. Instead, they allege that they were not given the statistics about the possible risks that he could develop a disability if he lived, and they should have been given the opportunity to withhold life-saving measures immediately after Emanuel's birth. Under the common law of Wisconsin and federal statutory law, however, Emanuel's parents did not have the right to withhold or withdraw imme-

diate post-natal care from him. Thus, no viable alternative health treatment existed to trigger the informed consent process.[4]

¶ 21. We now examine the applicability of the second part of the informed consent statute; i.e., the six exception sections, providing conditions under which the treating physician is not obligated to inform the patient. Germane to our analysis is subsection (5) which renders unnecessary the disclosure of "information in emergencies where failure to provide treatment would be more harmful to the patient than treatment."

¶ 22. The complaint alleges that "attempts . . . to interrupt the preterm labor . . . [were] unsuccessful" resulting in Emanuel's premature birth by cesarean section, and that "upon Emanuel Vila's delivery, he was immediately handed off to defendant Brent Arnold, M.D. who initiated heroic and extraordinary life saving measures" on him. The allegations suggest that an emergency arose requiring an immediate response, which occurred. Montalvo does not suggest that all emergency actions should have ceased while Arnold explained possible options. Such an argument would be

---

[4] In *Iafelice v. Zarafu*, 534 A.2d 417 (N.J. Super. Ct. App. Div. 1987), the New Jersey Appellate Division examined the exact same issue presented by this appeal and exclaimed:

> The mistaken premise of this appeal is that allowing the child to die untreated was a legally viable alternative . . . we find no support for the belief that a newborn child may be put to death through [allowing a natural delivery with no resuscitation efforts upon birth] on the mere expectation that she will, in some unquantified way, be a defective person. As the Supreme Court wrote in *Berman v. Allan*, 80 N.J. 421, 430, 404 A.2d 8 (1979), "It is life itself, that is jealously safeguarded, not life in a perfect state."

*Id.* at 418.

frivolous. Given the allegations of the complaint, it cannot be gainsaid that failure to provide treatment would have been more harmful than treatment.

¶ 23. Although Montalvo concedes that as parents they have "no right to terminate the child's life," they assert that if "there is a balance between giving therapies that help, but which may also seriously harm, the parents should be the final arbiters of that choice." In the exigent circumstances confronting the treating physician here, no "balance" existed as proposed by the parents. Failure to treat was tantamount to a death sentence. Under the pleaded circumstances, informed consent was not required.

## C. *Public Policy.*

¶ 24. The trial court, in rendering its oral decision reasoned:

> That as far as I can read from reading the materials in the complaint that presumes that the parents had a legally enforceable right to reject or withhold treatment. From what is alleged in the complaint there was no gap, space in time for which they could sit down and discuss statistics or any other manners of dealing with the situation. It was a life or death situation. When a child is not breathing there is no time —there is no time. Any —any amount of loss of oxygen could be devastating to the child certainly . . . .
>
> . . . What the doctors did was save this child's life, and I understand the legal position of the parents is that was a decision they should make, but I don't believe that's one that we as a community in our public policy that's been adopted by our state and our court can place wholly in the hands of the parents.
>
> Protection of children is something that the com-

munity has an interest, in and a parent does not have the right to withhold necessary emergency treatment, and I agree entirely that had the doctors acted in any other way they would face not only civil —civil cases against them but possibly criminal cases. We simply can't say that the possibility that this child could be disabled or even the probability if it is that strong is sufficient to withhold li[f]e-saving measures and decide this child does not deserve to live.

Without a doubt, a major underpinning of the court's decision was public policy.

¶ 25.   In Wisconsin, the interest in preserving life is of paramount significance. *L.W. v. L.E. Phillips Career Dev. Ctr.*, 167 Wis. 2d 53, 90, 482 N.W.2d 60 (1992). As a result, there is a presumption that continued life is in the best interests of a patient. *Id.* at 86. In the absence of proof of a persistent vegetative state, our courts have never decided it is in the best interests of a patient to withhold or withdraw life-sustaining medical care. When appropriate circumstances are present, Wisconsin courts have not hesitated to dismiss complaints on public policy grounds, particularly where allowing recovery would place an unreasonable burden on physicians or where allowing recovery would provoke an exercise that has no sensible or just terminal point. *Rieck v. Medical Protective Co.*, 64 Wis. 2d 514, 518–19, 219 N.W.2d 242 (1974).

¶ 26.   The physicians involved in the resuscitation measures could be faced with a "damned if you do, damned if you don't" dilemma as demonstrated by the result of *Burks v. St. Joseph's Hospital*, 227 Wis. 2d 811, 596 N.W.2d 391 (1999). In *Burks*, the physicians made a decision not to resuscitate based upon a judgment that a premature baby was not viable. *Id.* at 813. The baby

died. *Id.* The parents brought a claim under the Emergency Medical Treatment and Active Labor Act (EMTALA) against the physician who determined that the infant was not viable and who did not resuscitate the child. *Id.* at 814. The claim was allowed because a hospital is required to provide emergency room patients with a medical screening examination including care to stabilize them. *Id.* at 817–18. If treating physicians can be sued for failing to resuscitate a baby they feel is not viable, and for resuscitating a viable baby such as Emanuel, they are placed in a continuing "damned" status. The public policy of Wisconsin does not tolerate such a "lose-lose" enigma.

¶ 27. If the parents' claim is allowed to proceed, courts will be required to decide which potential imperfections or disabilities are, as characterized in appellant's brief, "worse than death." They will have to determine which disability entitles a child to live and which disability allows a third-party surrogate to withhold or withdraw life-sustaining treatment with the intent to allow a disabled person to die. This determination could vary greatly based on the parents' beliefs. One set of parents may view a particular disability as "worse than death," while another set of parents would not. Such a process, not unreasonably, has kaleidoscopic, unending implications. The trial court did not err in reaching its conclusion based upon public policy reasons.

*By the Court.*—Judgments affirmed.