[No. 78383-7. En Banc.]
Argued January 23, 2007. Decided November 8, 2007.

LIAM STEWART-GRAVES ET AL., *Appellants,* v. KATHERINE F. VAUGHN ET AL., *Respondents.*

118

*Paul L. Henderson* (of *Horenstein & Drew, PLLC*); *Anne E. Melley*; and *Philip A. Talmadge* (of *Talmadge Law Group, PLLC*), for appellants.

*Elizabeth A. Leedom* (of *Bennett Bigelow & Leedom, PS*); *Mary H. Spillane* (of *Williams Kastner Gibbs*); and *Scott T. Schauermann* (of *Hoffman Hart & Wagner, LLP*), for respondents.

*Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 MADSEN, J. — This medical malpractice case involves an infant who received 24 minutes of continuous resuscitative medical treatment after being born without a heartbeat. The infant survived but suffers severe and permanent disabilities. Nichole Stewart-Graves and Todd Graves, individually, and as guardians for their son, Liam Stewart-Graves (plaintiffs), filed suit against Dr. Katherine Vaughn, the Vancouver Clinic (her employer), and Southwest Washington Medical Center (defendants), claiming professional negligence and failure to obtain informed consent. The trial court granted defendants' summary judgment motion, ruling that a health care provider may not be held liable to an infant and/or an infant's parents based on lack of informed consent and negligence arising from failing to discontinue neonatal resuscitation efforts. We affirm.

## FACTS

¶2 On March 2, 2004, Nichole Stewart-Graves, who was then 35 weeks pregnant, went to the Southwest Washington Medical Center after experiencing mild labor contractions throughout the morning. Her pregnancy had been uncomplicated and an initial examination revealed a reassuring fetal heart rate. But a few hours after her arrival, a fetal monitor indicated a precipitous drop in the fetal heart rate. The attending physician obtained Stewart-Graves' verbal consent to perform an emergency caesarean section. Hospital staff notified Dr. Vaughn, the on-call physician for the hospital's neonatal resuscitation unit, that she was needed at the hospital. Meanwhile, Stewart-Graves was

taken to an operating room while her husband waited in a postoperative birthing center room.

¶3 Liam was delivered at 5:48 PM without a heart rate or spontaneous respiration, and with an Apgar[1] score of zero. The operating physician discovered that Stewart-Graves had suffered a placental abruption. A code team immediately began resuscitation efforts. At 5:52 PM, Dr. Vaughn arrived and took charge of the resuscitation. Every two minutes a member of the code team checked for a heartbeat, finding none until 24 minutes after birth, at which time Liam's heart began to beat spontaneously. Liam was transported to the neonatal intensive care unit of another hospital. He survived but suffers from severe cerebral palsy, mental retardation, a seizure disorder, microcephaly, respiratory distress requiring frequent suctioning, and he must be fed through a feeding tube. It is undisputed that Liam's condition is permanent and requires continuous, extensive, and tremendously costly medical care.

¶4 During the resuscitation, Nichole was unconscious from general anesthesia. Todd waited in the postoperative birthing room. Dr. Vaughn did not attempt to communicate with Todd during the 20 minutes she was resuscitating Liam. But a nurse went between the operating room and the birthing room every few minutes to update him on the course of events.

¶5 Nichole and Todd brought an action individually and on behalf of Liam against Dr. Vaughn, the Vancouver Clinic (her employer), and the Southwest Washington Medical Center, alleging the defendants were liable under theories of informed consent and negligence for denying them the opportunity to decide whether resuscitation should continue beyond 10 minutes and for failing to discontinue resuscitation efforts when it was no longer reasonably possible for Liam to survive without severe brain damage and other debilitating injuries. Liam made the same alle-

---

[1] An Apgar score is an evaluation of an infant's physical condition at birth, in which respiration, heart rate, reflex activity, color, and muscle tone are each rated zero, one, or two. *Miller v. HCA, Inc.*, 118 S.W.3d 758, 763 (Tex. 2003).

gations as his parents regarding lack of informed consent and negligence for continuing the resuscitation.[2]

¶6 The defendants moved for summary judgment. In an affidavit, Dr. Vaughn stated that Liam's condition at birth was "a recognized health care emergency" and that "[i]f resuscitation would have been paused or delayed at any point, Liam Stewart-Graves would not have survived." Clerk's Papers (CP) at 78. She also stated that she had to focus on the resuscitation, which required immediate action, and that "there was no time to obtain informed consent given the emergent nature of the situation." CP at 79.

¶7 In response to the summary judgment motion, the plaintiffs submitted an affidavit by neonatologist Dr. Carl J. Bodenstein. He opined that Liam's health care providers violated applicable standards of care by failing to adequately resuscitate him, by failing to obtain informed consent to continue resuscitation efforts after 10 minutes, and by failing to discontinue resuscitation efforts after 15 minutes. He did not dispute Dr. Vaughn's statement that a pause or delay would have resulted in Liam's death. But in his view, continuing Liam's resuscitation for 24 minutes violated the standard of care because it was "well beyond the point that the medical literature indicates that severe disability would be unavoidable if the infant survived at all." CP at 200; CP at 195. According to Dr. Bodenstein, the standard of care "required Dr. Vaughn to involve Mr. Graves in the decision whether or not to continue resuscitative efforts inasmuch as he and his wife would be responsible to care for their severely brain damaged child assuming Liam survived as he did in this case." CP at 202.

¶8 In Dr. Bodenstein's view, the failure to obtain informed consent cannot be excused on the grounds of an

---

[2] Liam also alleged that his health care providers were negligent in failing to intubate him within two minutes of delivery, failing to administer proper dosages of epinephrine in a timely manner, failing to administer an appropriate amount of intravenous fluids and glucose, and failing to timely administer sodium bicarbonate, thereby causing his birth injuries. This claim was voluntarily dismissed.

emergency because "the emergent circumstances of the resuscitation ceased after 10 minutes" without a spontaneous heart rate. CP at 203. He further stated that the standard of care "required Dr. Vaughn and the hospital code team to discontinue resuscitative efforts after 15 minutes of asystole [no heart rate]." *Id.* In support, he referred to a 1991 study appearing in a peer-reviewed journal, in which 55 of 56 infants with Apgar scores of zero at 10 minutes after birth died, and the surviving infant was severely impaired.

¶9 The plaintiffs also submitted a declaration by Todd Graves, stating that he would have asked the code team to cease resuscitation efforts after 10 minutes if he had been informed that Liam would likely not survive or would survive with severe disability. Nichole likewise declared that if she had known of the likelihood that Liam would survive with severe disabilities, she would have wanted her husband to direct the code team to cease resuscitation efforts.

¶10 The trial court granted summary judgment in favor of the defendants, agreeing that they were not liable to Liam or his parents for failing to obtain consent before continuing resuscitation beyond the point when it was highly probable that Liam would suffer severe disabilities if he survived. The plaintiffs then sought direct review of the trial court's summary judgment order, which this court granted.

## ANALYSIS

### Informed Consent Claims

¶11 Under the doctrine of informed consent, a health care provider has a fiduciary duty to disclose relevant facts about the patient's condition and the proposed course of treatment so that the patient may exercise the right to make an informed health care decision. *Miller v. Kennedy*, 11 Wn. App. 272, 282, 522 P.2d 852 (1974), *aff'd*, 85 Wn.2d

151, 530 P.2d 334 (1975). A health care provider may be liable to an injured patient for breaching this duty even if the treatment otherwise meets the standard of care. RCW 7.70.050; *Keogan v. Holy Family Hosp.*, 95 Wn.2d 306, 313, 622 P.2d 1246 (1980). The doctrine of informed consent is based on "the individual's right to ultimately control what happens to his body." *Id.* at 313-14. This court first recognized the doctrine in *ZeBarth v. Swedish Hospital Medical Center*, 81 Wn.2d 12, 499 P.2d 1 (1972). The legislature subsequently codified the prima facie elements of an informed consent claim in RCW 7.70.050. Laws of 1975-76, 2d Ex. Sess., ch. 56, § 10; Edwin Rauzi, *Informed Consent in Washington: Expanded Scope of Material Facts That the Physician Must Disclose to His Patient*, 55 Wash. L. Rev. 655 (1980).

■ ¶12 There are certain exceptions to the duty of disclosure. It is generally recognized that in emergency situations where immediate action is necessary for the protection of life, consent will be implied when it is impractical to obtain actual consent from a patient or the patient's authorized representative. *See generally* W.E. Shipley, Annotation, *Liability of Physician or Surgeon for Extending Operation or Treatment Beyond That Expressly Authorized*, 56 A.L.R.2d 695 (1957) (surveying cases). The emergency exception has deep roots in the common law. *See Schloendorff v. Soc'y of N.Y. Hosp.*, 211 N.Y. 125, 129-30, 105 N.E. 92 (1914) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . *except in cases of emergency* where the patient is unconscious and where it is necessary to operate before consent can be obtained" (emphasis added) (citations omitted), *overruled in part on other grounds by Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957); Restatement (Second) of Torts § 892D (1979) (a person is privileged to act without consent in order to prevent harm to another when an emergency makes it infeasible to obtain consent). It is based on the impracticality of having an adequate, informed consent discussion in the midst of a medical

emergency, and the importance of allowing a physician to maintain focus on providing lifesaving treatment to the patient. *See Canterbury v. Spence*, 150 U.S. App. D.C. 263, 464 F.2d 772, 788-89 (1972). The presumption underlying the emergency exception is that the harm from a failure to treat outweighs any harm threatened by the proposed treatment. *Id.* at 789.

¶13 The emergency exception is codified in RCW 7.70-.050(4):

> If a recognized health care emergency exists and the patient is not legally competent to give an informed consent and/or a person legally authorized to consent on behalf of the patient is not readily available, his consent to required treatment will be implied.

¶14 The plaintiffs here contend that dismissal of their informed consent claims on summary judgment was improper because there are material issues of fact as to whether "a recognized health care emergency" existed after 10 minutes of asystole and whether Liam's father was "readily available" to consent on Liam's behalf.

¶15 The existence of a medical emergency is ordinarily a factual question for the jury. *Shine v. Vega*, 429 Mass. 456, 709 N.E.2d 58, 65 (1999). Where reasonable minds could not differ on the issue, however, a court may determine that a medical emergency exists as a matter of law. *See Keogan*, 95 Wn.2d 306. In *Keogan*, this court held that a medical emergency existed, as a matter of law, when a patient arrived by ambulance to the hospital emergency room with severe, crippling chest pain and shortness of breath. *Id.* at 309. Tragically, the physician treated him for an anxiety attack, not recognizing that he was suffering a heart attack, and the patient died. After noting that "[i]t is generally agreed that the doctrine of informed consent does not apply in emergency situations requiring immediate action," this court held in *Keogan*, 95 Wn.2d at 316, that the physician had no duty to disclose alternative diagnostic procedures before providing immediate emergency treatment to the patient:

Keogan's intense pain, the need for immediate diagnosis of his condition, and the fact that his condition actually was such that it could lead to irremediable disability and quick death— created a medical emergency in which the emergency room physician could not be held to the physician's duty to disclose that is applicable to nonemergency medical care.

*Id.* at 316-17.

¶16 Accordingly, this court affirmed the trial court's dismissal of an informed consent claim brought on behalf of the decedent's estate. *Id.* at 317.

■ ■ ¶17 The plaintiffs argue that *Keogan* is distinguishable and its holding does not apply under the circumstances presented here. They first suggest that *Keogan* is inapplicable because it was decided under the common law duty of informed consent, not RCW 7.70.050. In adopting RCW 7.70.050, the legislature codified the common law doctrine of informed consent as set forth in *Miller*, 11 Wn. App. 272. *See* FINAL B. REP. on Substitute H.B. 1470, 44th Leg, 1st Ex. Sess., at 23 (Wash. 1976) (explaining that the bill incorporates the standard enunciated in *Miller* and otherwise reflects "existing law with respect to the doctrine of informed consent"). We find no indication that the legislature intended to abrogate the traditionally recognized exceptions to the duty to disclose. These exceptions are stated in *Holt v. Nelson*, 11 Wn. App. 230, 240-41, 523 P.2d 211 (1974), and this court acknowledged their continued viability following the enactment of RCW 7.70-.050. *Smith v. Shannon*, 100 Wn.2d 26, 30, 666 P.2d 351 (1983). In particular, as under the common law, the statutory emergency exception, RCW 7.70.050(4), requires proof of the existence of a medical emergency. Thus, *Keogan*'s holding has continuing application.

¶18 The plaintiffs also argue that *Keogan* is factually distinguishable because the evidence in that case established that the patient " 'was interested only in surcease of his pain through any means available . . . and that he would have agreed to any care relieving such pain.' " Br. of Appellants at 17 (quoting *Keogan*, 95 Wn.2d at 316). In

contrast, the evidence here suggests that Liam's parents would not have consented to the continuation of resuscitation efforts if they had been informed of the likelihood that he would be severely disabled, if revived. Application of the emergency exception, however, does not turn on whether the patient would have consented, if fully informed. Under the emergency exception, consent is implied by law in view of the existence of a recognized health care emergency and the impracticality of obtaining informed consent in such circumstances. Proof that a patient would have consented if properly informed is a traditionally recognized defense to an informed consent claim that is distinct from the emergency exception. *See Holt*, 11 Wn. App. at 241. Keogan's apparent willingness to consent to any treatment that might alleviate his severe pain is relevant to the emergency exception only insofar as it demonstrates the impracticality of obtaining informed consent when a patient is incapable of making a reasoned decision due to incapacitating pain. In this case, the impracticality of obtaining informed consent is demonstrated by other compelling facts. To an even greater extent than in *Keogan*, the exigencies of the situation here required immediate treatment because the failure to treat meant certain and immediate death.

¶19 The plaintiffs do not dispute that a recognized health care emergency existed immediately following Liam's birth. Nor do they dispute that Liam would have died if Dr. Vaughn had paused or delayed the resuscitation at any point. Rather, relying on Dr. Bodenstein's declaration, they contend that the emergency ceased when resuscitation efforts were unsuccessful after 10 minutes and it was no longer reasonably possible for Liam to survive without severe disabilities. However, to suggest that a medical emergency ceases to exist once it becomes apparent to a physician that a patient will inevitably suffer severe disabilities is untenable. No reasonable person could deny that a recognized health care emergency existed throughout the period of Liam's resuscitation. In terms of gravity and urgency, it is hard to imagine a situation of greater

urgency than exists when a nearly full-term newborn with no recognized prenatal disorders requires neonatal resuscitation. Accordingly, we hold that a recognized health care emergency existed in this case, as a matter of law, until the resuscitation ended.

■ ¶20 Turning next to whether a legally authorized representative is "readily available" to consent, this, too, is generally a factual question that must be determined by the jury unless reasonable minds could not differ. Undisputedly, a parent may consent on behalf of a minor patient under RCW 7.70.065(2)(a)(iii), and there is no doubt that Liam's father was his legally authorized representative for purposes of giving informed consent. However, we hold that under the circumstances presented here, as a matter of law, Liam's father was not "readily available" within the meaning of the statute.

■ ¶21 "Readily available" means more than mere physical proximity—there must be sufficient time and opportunity for discussion and deliberation. In *Miller v. HCA, Inc.*, 118 S.W.3d 758 (Tex. 2003), the Texas Supreme Court confronted facts similar to those presented here, involving an infant delivered by emergency caesarean section at 23-weeks' gestation that received lifesaving resuscitation contrary to the parents' wishes. The infant survived but later suffered a brain hemorrhage, a common complication of premature birth, which resulted in severe and permanent disabilities. In rejecting the parents' informed consent claim, the court in *Miller, id.* at 769, concluded that even though the parents were present in the delivery room, "there was simply no time to obtain their consent to treatment . . . without jeopardizing [the infant's] life" because the infant might survive with treatment but would likely die if treatment were postponed. *See also Montalvo v. Borkovec*, 2002 WI App 147, 256 Wis. 2d 472, 647 N.W.2d 413, 420 (holding that the informed consent doctrine does not apply in the context of emergency treatment provided to a neonate following a caesarean procedure because the failure to treat would be "tantamount to a death sentence").

In this case, as well, there was no time for discussion and deliberation to consider alternatives to treatment, assuming viable alternatives even existed.

¶22 The decision to refuse lifesaving treatment is the most momentous health care decision that an individual can make. "The choice between life and death is a deeply personal decision of obvious and overwhelming finality." *Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 281, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990). The decision is made more complex when it has been entrusted to a surrogate decision maker. *See id.* at 287 n.12 ("The differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical treatment, are so obviously different that the State is warranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class."); Norman L. Cantor, *The Bane of Surrogate Decision-Making: Defining the Best Interests of Never-Competent Persons*, 26 J. LEGAL MED. 155, 162-63 (2005) (identifying several factors that counsel caution in allowing surrogate decision makers to make end-of-life decisions on behalf of never-competent persons); Rebecca S. Dresser & John A. Robertson, *Quality of Life and Non-Treatment Decisions for Incompetent Patients: A Critique of the Orthodox Approach*, 17 J.L. MED. & HEALTH CARE 234, 241-42 (1989) (discussing the inherent difficulty of a fully-capacitated surrogate to consider the point of view of a profoundly disabled person). We need not decide, here, whether a parent may decide to refuse lifesaving treatment on behalf of a child and, if so, under what circumstances. For purposes of this analysis, we need only recognize that such a decision cannot be truly "informed" in the context of neonatal resuscitation when the circumstances permit no more than a hasty explanation of probable outcomes by a physician whose attention must primarily focus on lifesaving efforts.

■ ¶23 We hold that Liam's father was not "readily available," as a matter of law, because there was no mean-

ingful opportunity for a deliberate, informed decision to refuse consent where the failure to treat meant certain and immediate death.

## Wrongful Birth/Wrongful Life Claims

¶24 The plaintiffs next contend that summary judgment on their negligence claims was improper because a genuine issue of material fact exists as to whether Dr. Vaughn breached the applicable standard of care by failing to discontinue resuscitation when it became highly probable that Liam would be severely disabled if he survived. They assert that their claims properly rest on the right of parents to prevent the birth of a child with deficits and the child's corresponding right not to be born to suffer a severely disabled existence, as recognized in *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 656 P.2d 483 (1983).

¶25 We turn first to the parents' claims. In *Harbeson*, this court recognized that parents may assert a cause of action for "wrongful birth" under the theories of informed consent and negligence, based on a health care provider's failure to impart information or to perform medical procedures with due care, when the proximate result is the birth of a child with deficits. In that case, the mother was prescribed Dilantin to treat her epilepsy. She and her husband informed physicians that they planned to have children and asked whether the Dilantin would pose any risks of birth defects. The physicians negligently failed to inform them of known risks. The Harbesons subsequently had two children born with birth defects. They would have chosen not to conceive if the physicians had informed them of the potential birth defects associated with the use of Dilantin during pregnancy.

¶26 In deciding whether to permit the parents to bring a wrongful birth action, the *Harbeson* court stated that "[t]he critical concept is duty. The core of our decision is whether we should impose upon health care providers a duty correlative to parents' *right to prevent the birth* of defective

children." *Id.* at 471 (emphasis added). This court concluded that the imposition of such a duty was appropriate in light of advances in medical technologies which make it possible to predict the occurrence of genetic defects and to diagnose abnormalities in the unborn fetus. *Id.* at 471-72. The duty requires health care providers to impart material information as to the likelihood of birth defects and to perform sterilization and abortion procedures with due care.

¶27 In *Benoy v. Simons*, 66 Wn. App. 56, 831 P.2d 167 (1992), the Court of Appeals correctly recognized that *Harbeson* does not apply when the alleged negligence occurs after a child is born. In that case, a premature infant suffered severe respiratory distress syndrome and a brain hemorrhage after being born by emergency caesarean section. He was placed on a ventilator and treated in an intensive care nursery, but about five weeks later the ventilator was removed and the infant died. His mother argued that the wrongful birth action recognized in *Harbeson* should be extended to permit suit based on the health care provider's failure to obtain her consent before placing the infant on the ventilator. *Benoy*, 66 Wn. App. at 62. The Court of Appeals disagreed, stating that "[t]he analogy is unsound because *Harbeson*, [98 Wn.2d] at 473, is based on recognition that parents have a right to prevent the birth of a defective child and health care providers have a duty to the parents correlative to that right." *Benoy*, 66 Wn.2d at 62. The Court of Appeals observed that the duty recognized in *Harbeson* is owed by a health care provider to a parent *as patient*, to provide nonnegligent genetic counseling and prenatal care so that parents may avoid the birth of a child with deficits. The Court of Appeals concluded that *Harbeson* was inapplicable because the parent was not the patient.

¶28 We agree with the *Benoy* court's reasoning. The right to prevent the birth of a child is based on the parents' constitutional right to reproductive autonomy. *See Harbeson*, 98 Wn.2d at 472 (noting that "[t]he difficult moral choice" of aborting a fetus rests with the parents)

(citing *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)); *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (constitutional right of privacy encompasses right of married couples to use contraception). Before birth, a fetus has no cognizable constitutional interests to balance against the mother's liberty interest. At the point of viability, however, the State's interest in the preservation of potential life intervenes. *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). Once an infant is born, of course, the parents' right to reproductive autonomy is fully displaced by the infant's constitutionally protected right to life. Because Liam was already born when the alleged negligence occurred, the duty we recognized in *Harbeson* does not apply in this case.

¶29 The Supreme Courts of Wisconsin and Texas also have addressed the issue of whether parents may hold a physician liable under the theories of informed consent and/or negligence based on the failure to refrain from emergency resuscitation of a newborn infant. Both courts have rejected such claims, reasoning that parents do not have a right to withhold lifesaving treatment from a newborn, even when it is highly likely that the newborn will be severely disabled, if revived. *Miller*, 118 S.W.3d 758; *Montalvo v. Borkovec*, 2002 WI App 147, 256 Wis. 2d 472, 647 N.W.2d 413, 420.

¶30 *Montalvo* involved the premature birth of an infant at 23-weeks' gestation by emergency caesarean section. *Id.* The infant survived as a result of resuscitation measures provided following birth but suffered severe disabilities. The parents alleged that health care providers were negligent for denying them the opportunity to refuse consent to lifesaving treatment for the newborn. Under Wisconsin law, a surrogate decision maker may refuse consent to lifesaving treatment only when an individual is in a persistent vegetative state. *Id.* at 418. Similarly, federal statutory law binding on the state prohibits health care providers from withholding emergency care to a newborn

infant.[3] Accordingly, the court rejected the claim, concluding that parents do not have a right, under state or federal law, to withhold or withdraw immediate postnatal care from an infant.

¶31 The plaintiffs attempt to distinguish *Montalvo* on the basis that, unlike Wisconsin law, Washington law extends the right to refuse life-sustaining treatment to persons suffering a terminal condition. Br. of Appellants at 35 (citing RCW 70.122.010, the Natural Death Act). The Natural Death Act applies to competent adults, not minors, and carefully conditions the right to refuse lifesaving treatment on fulfillment of a number of procedural safeguards that are absent under the circumstances presented here. Our case law recognizes the constitutional right of an incompetent adult "to refuse treatment that serves only to prolong the dying process, given the absence of countervailing state interests." *In re Welfare of Colyer*, 99 Wn.2d 114, 120, 660 P.2d 738 (1983). This right may be exercised by a guardian on behalf of an incompetent patient whose wishes cannot be known, when treatment would provide no measure of recovery but would merely postpone death for someone in the advanced stages of an incurable, terminal illness. *In re Guardianship of Hamlin*, 102 Wn.2d 810, 815, 689 P.2d 1372 (1984).

¶32 The right to withhold lifesaving treatment as recognized by statute and case law does not support a wrongful birth claim by Liam's parents. First, Liam was neither

---

[3] The United States Child Abuse Prevention and Treatment Act (CAPTA) of 1996, Pub. L. No. 104-235, 110 Stat. 3063 (codified at 42 U.S.C. § 5101) conditions the receipt of federal funds for the prevention of child abuse and family protection on a state's willingness to establish procedures to ensure that health care providers do not withhold or withdraw lifesaving medical treatment from a disabled infant, unless the such treatment would be "virtually futile" and "inhumane." 42 U.S.C. § 5106g(6)(C). The implementing regulations provide that nontreatment may not be based on "subjective opinions about future 'quality of life' of a . . . disabled person." 45 C.F.R. pt. 1340 app. A state may avoid the regulations by electing not to receive CAPTA funds. Neither party has briefed the applicability of CAPTA in this case. According to public records, Washington State is a recipient of CAPTA funds. *See* Office of Family & Children's Ombudsman, *available at* http://www.governor.wa.gov/ofco/gal/galsum.htm (last visited Oct. 29, 2007).

terminally ill nor in a persistent vegetative state. Second, when recognized, the right to withhold lifesaving treatment is personal to the patient, it does not belong to the person who exercises that right on behalf of an incompetent. Thus, even assuming Liam had a right to withholding of life-sustaining treatment, his parents could not assert a cause of action based on the violation of that right. Accordingly, we hold that a health care provider owes no duty to the parents of an infant to discontinue resuscitation when it becomes highly probable that the infant will be severely disabled.

¶33 The plaintiffs also contend that Liam should be permitted to pursue a wrongful life cause of action recognized in *Harbeson*. As mentioned, the *Harbeson* court recognized a cause of action not only for wrongful birth but also for wrongful life. The wrongful life cause of action is "the child's equivalent of the parents' wrongful birth action." *Harbeson*, 98 Wn.2d at 478. In recognizing a wrongful life claim, this court reasoned that it would be anomalous to permit recovery by the parents alone. Allowing recovery by the child would provide a "comprehensive and consistent" compensation scheme and would deter malpractice. *Id.* at 481. Hence, the duty of health care providers to provide nonnegligent prenatal counseling and medical care extends to children not yet conceived or born. *Id.*

¶34 Relying on *Harbeson*, Liam insists that he may assert a wrongful life claim regardless of whether this court recognizes his parents' claim of wrongful birth. The respondents contend that the failure of Liam's parents' wrongful birth claim precludes Liam's wrongful life claim because the latter is derivative of the former.

¶35 Whether a wrongful life claim is described as derivative of a parent's wrongful birth claim or whether the claim is viewed as an independent cause of action is irrelevant. As discussed above, *Harbeson* applies when a health care provider breaches a prenatal duty to parents and children; it does not apply when the breach occurs after birth, as allegedly occurred in this case.

### Standard of Care Claims

¶36 The plaintiffs also claim negligence based on the respondents' failure to follow the standard of care in providing medical treatment. Similarly, amicus Washington State Trial Lawyers Association Foundation argues that although the wrongful birth and wrongful life claims recognized in *Harbeson* may be inapt, the principle recognized in that case—that a disabled life may itself be a legally cognizable injury when the alternative is nonexistence— may be exported to support a negligence claim under our medical malpractice statute. RCW 7.70.040.

¶37 Relying on Dr. Bodenstein's affidavit, the plaintiffs contend that an issue of fact exists as to whether Dr. Vaughn breached the standard of care by failing to stop the resuscitation after 15 minutes of asystole. The basis for Dr. Bodenstein's conclusion is that the resuscitation continued "well beyond the point that the medical literature indicates that severe disability would be unavoidable if the infant survived at all." CP at 200. Further, according to Dr. Bodenstein, the standard of care "required Dr. Vaughn to involve Mr. Graves in the decision whether or not to continue resuscitative efforts inasmuch as he and his wife would be responsible to care for their severely brain damaged child assuming Liam survived as he did in this case." CP at 202.

¶38 We reject the plaintiffs' claim and hold that, as a matter of law, we will not recognize a standard of care that requires a health care provider to withhold treatment of a newborn infant based on the likelihood that the infant will be severely disabled, if it survives.

¶39 As recognized by statute and case law, under certain circumstances, an adult may choose to refuse life-sustaining treatment in exercising the right to bodily integrity and the constitutional right to privacy. *See* ch. 70.122

RCW (Natural Death Act);[4] *In re Guardianship of Grant*, 109 Wn.2d 545, 747 P.2d 445, 757 P.2d 534 (1987); *Hamlin*, 102 Wn.2d 810; *Colyer*, 99 Wn.2d 114.[5] It arises from a person's constitutional right to privacy and right to bodily integrity. The right is not absolute, however, but may be overcome by countervailing state interests, including (1) the preservation of life, (2) the protection of innocent third parties, (3) the prevention of suicide, and (4) maintaining the ethical integrity of the medical profession. *Grant*, 109 Wn.2d at 556; *see also Cruzan*, 497 U.S. at 284 (the state may require "clear and convincing" evidence of an incompetent patient's wishes as a condition for allowing the withdrawal of life-sustaining medical treatment).

¶40 As this court has recognized, the State's interest in the preservation of life may permit the State to compel a patient to accept life-sustaining treatment. *Colyer*, 99 Wn.2d at 124. However, if the patient's condition is hopeless and there is " 'no reasonable possibility of returning to a cognitive, sapient state,' the patient's right of privacy outweighs the State's interest in preserving life." *Id*. at 134 (quoting *Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977) (recognizing right to withhold life-sustaining treatment from a formerly competent adult in a permanent vegetative state)). Similarly, the State's interest in preserving life weakens considerably "if treatment will merely postpone death for a person with a terminal and incurable condition." *Grant*, 109 Wn.2d at 556. However, this court has "stress[ed] the distinction between treatment which is expected to result in some measure of recovery and that which merely postpones death." *Hamlin*, 102 Wn.2d at 815

---

[4] The Natural Death Act recognizes the right of a competent adult to refuse, by advance directive, life-sustaining medical treatment when the adult is in a terminal or permanently unconscious condition. RCW 70.122.030. The act does not apply here because Liam is not a competent adult.

[5] *Cruzan*, 497 U.S. at 278 (recognizing a competent person's constitutionally protected liberty interest in refusing lifesaving medical intervention); *Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997).

(allowing the withholding of life-sustaining treatment from a never-competent adult in a persistent vegetative state). Accordingly, there must be agreement by at least two physicians as to the patient's prognosis. *Grant*, 109 Wn.2d at 566. In the case of a newly born viable infant requiring emergency resuscitation, the preservation of life is an important interest. Whether the infant's condition is "hopeless" cannot be determined on the basis of statistics and probabilities but requires assessment of the infant's actual condition once the infant is stable.[6]

¶41 The State's interest in protecting innocent third parties also may prevail over a patient's right to refuse life-sustaining treatment. This interest is implicated when an immediate family member disagrees with the decision to withhold life-sustaining treatment from an incompetent patient. *See id.* at 556-57. In *Grant*, this court reasoned that the State's interest in protecting innocent third parties was not implicated because the patient's immediate family members unanimously agreed that withholding life-sustaining treatment was in the patient's best interests. In this case, there was no unanimous agreement of Liam's immediate family members because his mother was unconscious. Where, as here, a parent is temporarily unavailable to participate in the decision, the State's interest in protecting innocent third parties weighs heavily against finding a right to refuse life-sustaining treatment.

¶42 The remaining interest identified in *Grant*, which is implicated here, is the State's interest in maintaining the ethical integrity of the medical profession. By statute, health care providers are protected from liability for refusing to comply with a patient's advance directive to withhold or withdraw life-sustaining treatment. RCW 70.122.060. In allowing the withdrawal of life-sustaining

---

[6] *See* Beth Ann Wright, *Process—The Best Medicine for Seriously Ill Infants*, 2 J. HEALTH & BIOMED. L. 69, 88-92 (2006) (suggesting that judicial unwillingness to allow a tort remedy for the failure to withhold lifesaving treatment when an infant's prognosis is unknown furthers interests of State and infant in preservation of life).

treatment from a never-competent, terminally-ill patient, this court reasoned that the ethical integrity of the medical profession was not implicated because the prevailing ethical standards recognized that this may be in the patient's best interest. *Grant*, 109 Wn.2d at 557. Moreover, under our case law a physician who disagrees with the decision to withhold or withdraw life-sustaining treatment may seek judicial intervention. *Colyer*, 99 Wn.2d at 132-33. The ethical integrity of the profession would be gravely compromised by recognizing the right of a newborn viable infant, through its guardian, to refuse life-sustaining treatment when the infant is neither terminally ill nor comatose, but suffers from some as-yet unquantifiable level of disability. Unlike in the case of the terminally ill and comatose, there is no emerging medical consensus that it is ethically appropriate to withdraw life-sustaining treatment from the disabled, even the severely disabled.[7]

¶43 Even if we were to recognize that a *patient* may choose to refuse life-sustaining treatment as a personal medical decision, that is not to say that a *physician* may unilaterally impose such a value preference under the guise of an expert medical judgment. The right to refuse life-sustaining treatment belongs to the patient. Until the patient exercises that right, "physicians are under an ethical, moral and legal duty to treat the patient so as to advance his recovery and alleviate his suffering." *Hamlin*, 102 Wn.2d at 819. Physicians must presume that life is preferable to death, even if that means a severely disabled life.

¶44 This court has repeatedly acknowledged that the withholding of life-sustaining treatment implicates important policy considerations that the legislature is best able to address. *Id.* at 822 ("The Legislature is the better forum in

---

[7] *See, e.g.*, Sadath A. Sayeed, *The Marginally Viable Newborn: Legal Challenges, Conceptual Inadequacies, and Reasonableness*, 34 J.L. MED. & ETHICS 600 (2006) (discussing conflicting viewpoints among medical ethicists on when it is appropriate, if ever, to withhold treatment from a marginally viable newborn short of medical futility).

which to fashion the necessary procedures to safeguard the rights and liabilities of the many persons and institutions involved in this complex arena."); *Colyer*, 99 Wn.2d at 118 (noting that the Natural Death Act is "a salutary step towards establishing legislative guidance in this area"). By enacting RCW 70.122.060, the legislature expressed an unequivocal policy to absolve health care providers from liability for refusing to participate in the withholding or withdrawal of life-sustaining treatment. Although the Natural Death Act does not apply here, holding the defendants liable for wrongfully prolonging Liam's life would be inconsistent with the public policy expressed in the act.

¶45 Dr. Bodenstein's conclusion regarding the standard of care rests on the premise that death is preferable to a severely disabled life as a matter of medical judgment. But that is a value judgment that may not be resolved by expert medical opinion. Just as Dr. Bodenstein's opinion was insufficient to raise an issue of material fact as to the existence of a medical emergency, it is insufficient to raise an issue of material fact as to the standard of care. *See Guile v. Ballard Cmty. Hosp.*, 70 Wn. App. 18, 25, 851 P.2d 689 (1993) (expert's unsupported assertion that a physician violated the standard of care held insufficient to raise a genuine issue of material fact).

¶46 Accordingly, we affirm the trial court's grant of summary judgment.

## CONCLUSION

¶47 We recognize the complex issues involved in withholding life-sustaining treatment. In this case we are asked to recognize the right of parents and infants, through their parents, to hold health care providers liable in negligence for failing to withhold resuscitative medical treatment from an infant born without a heartbeat. We decline to do so. Rather, we hold that the trial court here properly dismissed the negligence claim by Liam's parents because Dr. Vaughn had no duty to obtain their consent before resuscitating

him. Further, we hold that the trial court properly dismissed Liam's negligence claim because there is no genuine issue of material fact as to whether Dr. Vaughn violated the applicable standard of care by failing to discontinue resuscitation efforts. We affirm the trial court.

C. JOHNSON, BRIDGE, OWENS, and FAIRHURST, JJ., concur.

¶48 ALEXANDER, C.J. (concurring) — I agree with the majority that the trial court properly granted summary judgment for the defendants in this case. I believe, however, that both of the claims before us fail for the same reason: absence of injury. Because the majority does not recognize this defect, I write separately.

¶49 To bring an action against a medical professional for either negligence or failure to obtain informed consent, a plaintiff must show that injury resulted. RCW 7.70.030-.040 (injury resulting from negligence); RCW 7.70.050 (injury resulting from treatment given without informed consent); *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 468, 473, 482, 656 P.2d 483 (1983) (injury resulting from negligence and, specifically, from wrongful birth or wrongful life). The plaintiffs here do not claim that the continuation of resuscitation efforts beyond 10 or 15 minutes caused Liam Stewart-Graves's brain damage; rather, the injury they allege is the successful consequence of those efforts. The plaintiffs, in sum, would have us recognize Liam's survival as an injury.

¶50 I cannot equate the saving of a life with injury. This court has previously recognized the existence of a "fundamental public policy" in this state "encouraging citizens to save human lives from life threatening situations." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 944, 950, 913 P.2d 377 (1996). "Society places the highest priority on the protection of human life." *Id.* at 944. Thus, we did not hold in *Harbeson* that life itself could be an injury; rather, we said that "the *birth* of a defective child . . . is an actionable injury." *Harbeson*, 98 Wn.2d at 473 (emphasis added). The plaintiffs' complaints here, by contrast to those in

*Harbeson*, arise not from the fact that Liam was born but from actions occurring entirely after he was born. Declaring the success of those lifesaving actions to be an injury would contravene our State's clear public policy encouraging such efforts. Accordingly, I would conclude that plaintiffs, as a matter of law, have shown no injury resulting from the continuation of resuscitation efforts. Their claims, therefore, were properly disposed of by summary judgment. I concur.

SANDERS and J.M. JOHNSON, JJ., concur with ALEXANDER, C.J.

¶51 CHAMBERS, J. (concurring in result) — This is a sad case involving a doctor who, during a crisis, fought to save a newborn child by providing resuscitation for 24 minutes. Now the doctor is being sued because the child survived with severe permanent disabilities. I concur with the majority that the doctor is not liable under informed consent or negligence theories. I write separately to suggest a more limited analysis.

¶52 Among other things, Nicole Stewart-Graves and Todd Graves claim the doctor failed to obtain informed consent and did not meet the standard of care. I agree with the majority that the emergency exception to the informed consent requirement defeats the informed consent claim in this case. *Cf.* RCW 7.70.050. It is undisputed that a medical emergency existed when Liam Stewart-Graves was born. The doctor was faced with a life or death decision to continue resuscitation efforts and neither parent was meaningfully available to consult. Under the emergency exception to the informed consent requirement, the doctor had no duty to obtain informed consent.

¶53 Appellants contend that not only was the doctor required to obtain their consent to continue resuscitation but also that after 15 minutes, the doctor was required to stop resuscitation entirely. The appellants couch this argument in terms of the standard of care. They argue that the standard of care requires the doctor to stop resuscitation when it becomes nearly certain that the child will suffer

either death or severe and permanent disabilities. However, I find, as a corollary to the emergency exception to the informed consent requirement, there is no duty to stop emergency lifesaving care after it has begun just because the patient has little to no chance of survival without severe disabilities. It was undisputed that if Dr. Katherine Vaughn had paused in the resuscitation efforts, Liam would have died. Her decision to continue resuscitation until she had exhausted all possibilities was a reasonable response to an emergency.

¶54 I agree with the majority, "to suggest that a medical emergency ceases to exist once it becomes apparent to a physician that a patient will inevitably suffer severe disabilities is untenable." Majority at 126. It is untenable because it offends the policy behind our "Good Samaritan" law, RCW 4.24.300, and the emergency exception to the informed consent requirement. *See* RCW 4.24.300; RCW 7.70.050. That policy is to encourage people to respond to emergencies, especially life-threatening emergencies. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 939, 913 P.2d 377 (1988). Indeed, we have described this policy as a "compelling social need." *Burkhart v. Harrod*, 110 Wn.2d 381, 398, 755 P.2d 759 (1988).

¶55 It is true that once a person responds to an emergency, she must meet the appropriate standard of care. In the case of a physician, the standard of care is an exacting one. But we need not analyze the standard of care to decide this case. A physician simply owes no duty to stop trying to save a life during an emergency. It would frustrate the purpose of the emergency exception to the informed consent requirement if a physician who begins lifesaving resuscitation efforts must stop after 5 minutes or 10 minutes or 15 minutes merely because, although the patient may live, the patient will have permanent disabilities. I would hold as a matter of law that, if an emergency exists such that the duty to obtain informed consent for resuscitation is waived, there is also no duty to stop resuscitation merely because the patient may survive but with permanent disabilities.

¶56 I agree with the majority that the wrongful birth/ wrongful life action recognized in *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 656 P.2d 483 (1983), does not apply because there is no allegation of negligent prenatal counseling or procedures. However, given my disposition of the informed consent and standard of care issues, I would not discuss it further. I respectfully concur in the result.